**Leonard DRABIK, Appellee,**

v.

**STANLEY–BOSTITCH, INC., Defendant,**

**Bostitch, a Division of Textron, Inc., Appellant.**

**No. 92–3246.**

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1993.

Decided July 14, 1993.

Richard A. Ahrens, St. Louis, MO, argued (John E. Hall and David R. Buchanan, on brief), for appellant.

Paul L. Redfearn, Kansas City, MO, argued (Daniel R. Brown, on brief), for appellee.

Before FAGG and MAGILL, Circuit Judges, and STUART,* Senior District Judge.

MAGILL, Circuit Judge.

## I. INTRODUCTION

This is a products liability case and our jurisdiction is based on diversity of citizenship. In May 1987, Leonard Drabik sustained head and brain injuries from a nail discharged by a pneumatic nailing tool while constructing a storage shed with another individual named Charles Daniels. Drabik sued the manufacturer under § 402A of the Restatement (Second) of the Law of Torts, contending that the nailer was negligently designed and was a defective product. A jury awarded Drabik $1.5 million in actual damages and $7.5 million in punitive damages. This appeal followed. For the reasons discussed below, we remand this case for a new trial on the issue of liability and the issue of damages.

## II. FACTS

### A. The Product

The product at issue in this case is a model N16CT pneumatic nailer manufactured in September 1984 by appellant Bostitch Division of Textron, Inc. (Bostitch). This nailer is a hand held tool attached to a compressed air supply which generates sufficient power [1] to drive nails ranging from two to three-and-one-half inches in length. The N16CT is a "contact trip" nailer. Contact trip nailers have two devices that must both be engaged in order for the nailer to be actuated, i.e., to discharge a nail. The first device, the contact trip itself, is a work contact element—a spring-loaded, telescoping, conical device on the tip of the instrument that is engaged when it is pressed against any surface. The second device, the trigger, is located on the handle of the nailer and it is squeezed by the operator's finger, much like the trigger of a gun.

With a contact trip nailer, both the trigger and the contact trip must be depressed in order for a nail to be ejected, but it does not matter which is depressed first. In other words, if the contact trip is engaged and then the trigger is pulled, a nail will be discharged. Similarly, if the trigger is depressed first and the contact trip then becomes engaged, either intentionally or inadvertently, a nail will also be discharged. With a contact trip nailer, a user can drive a series of nails without having to squeeze the trigger each time. This is accomplished by holding the trigger down and simply moving and pressing the nailer's contact trip against the work. In this opinion, this process will be referred to as bump-firing.

A contact trip nailer can also be used for a process called placement firing. When using the tool in this manner, the user would leave his finger off the trigger and depress the contact trip against the precise location for the nail. After engaging the contact trip, the user would then squeeze the trigger to actuate the nailer.

### B. The Accident

Charles Daniels and Leonard Drabik had been friends for over a dozen years prior to the accident. Daniels was in the home improvement trade and had a sideline business constructing and selling storage sheds. Drabik helped Daniels in the shed construction business in exchange for a share of the profits. The two men worked out of Daniels' garage and driveway area. Typically, they would build the front, back, side wall, and roof sections in Daniels' garage and then assemble the pieces at the customer's home.

The day of the accident, the two men were constructing a side wall. A side wall consisted of two long 2 × 4s, called the top plate and bottom plate, held together by a series of shorter 2 × 4 studs which were then covered by siding. In building the side wall, the men would first nail together the top plate, the bottom plate, and the two end studs to form a rectangle. The remaining 2 × 4 studs were filled in at sixteen-inch intervals by first

---

* THE HONORABLE WILLIAM C. STUART, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

1. The compressed air generates pressure ranging from 60 to 100 pounds per square inch.

nailing them into the top plate and then the bottom plate. The two men had marked the locations where the shorter studs were to be placed underneath the top plate. The side wall was approximately forty inches high.

At the time of the accident, the men were working inside Daniels' garage with the side wall standing up instead of laying flat. Drabik and Daniels testified that they had the wall standing up because it was somewhat crowded in the garage and this also prevented them from having to bend over so much. Daniels admitted that they would have had room to lay the wall out flat, however.

Daniels was on Drabik's right and both men were on the same side of the wall. Drabik was facing the wall directly, and was holding the top plate. Daniels was also facing in the direction of the wall, but was turned slightly towards Drabik, so that Daniels was not squarely addressing the wall. Drabik was placing a shorter stud between the top plate and the bottom plate. The stud was the first one in from the outer edge of the original rectangle. Because the marks were underneath the top plate, Drabik had to bend down and look underneath the top plate to line up the stud correctly. Daniels held the nailer in his right hand with his left hand at his side. After Drabik lined up the stud, Daniels reached over with the nailer and bump-fired two nails into the top plate to fasten it to the shorter stud. It was after Daniels had driven the two nails that Drabik's head contacted the nailer and the injury occurred.

Daniels testified that immediately before the accident, Drabik had been looking up underneath the top plate. Daniels bump-fired the two nails and then Drabik got up and walked away from him. As Daniels was in the process of returning the nailer to his right side, he realized that the nailer had gone off a third time, injuring Drabik. Daniels said he did not expect Drabik to be in the path of the nailer. On cross-examination, Daniels admitted that he was "more or less" reaching over Drabik to bump-fire the nails. Tr. Vol. II at 222. Daniels also admitted that he could have done the nailing by placement firing instead of bump-firing, i.e., engaging the contact trip first and then pulling the trigger rather than having the trigger pulled first and then depressing the contact trip to actuate the tool.

According to Drabik's testimony, he had placed the stud underneath the top plate and then "backed off" while still holding the top plate. Daniels bump-fired two nails into the work. The second nail caused the stud to twist. Drabik then testified that he was going to grab his hammer and knock the stud around into place but he said nothing to Daniels about what he was intending to do. Drabik reached down and turned up to look underneath the top plate just as Daniels was drawing the nailer away from the work and returning it to his right side. At that time the left side of Drabik's head engaged the contact trip and the tool discharged, driving a nail into his brain. Drabik admitted on cross-examination that he could have been positioned on the opposite side of the wall from Daniels instead of next to him on the same side of the wall.

There was no evidence of a manufacturing defect or a product malfunction. The evidence was clear that Drabik's head bumped into the contact trip while Daniels' finger was depressing the trigger, thus actuating the nailer. Plaintiff's and defendants' experts testified that the nailer had worked exactly as designed.

## C. The Users' Backgrounds

Daniels had been involved in carpentry work all his life. He had worked primarily in the home improvement business and had experience with a variety of power tools. For four or five years prior to 1987, Daniels had worked with contact trip pneumatic nailers similar to the N16CT. Daniels testified that he understood the two uses of the nailer, bump-firing and placement firing. He testified he had heard of other people being injured by inadvertent actuation of a contact trip nailer, though he had never personally experienced an injury. Daniels also testified that he knew if the contact trip bumped into a person while the operator held the trigger depressed, the nailer would discharge into the person.

Daniels was the owner of the nailer involved in the injury. However, Daniels had not purchased the nailer. He received it from a customer in exchange for the construction of a storage shed a few weeks before the accident. It was the first pneumatic nailer he had personally owned. Daniels did not receive an owner's manual in the exchange, and at the time he received the tool, there were no warning labels on it.

Drabik was also an experienced carpenter who had been involved in construction work since 1970. Drabik had worked periodically in most of the construction trades and had once built a house for himself. He testified he had worked with various power tools including pneumatic nailers. By his estimate, Drabik had individually operated a contact trip nailer on forty to fifty occasions prior to the accident and had been part of a crew which used a nailer an additional one hundred to one hundred fifty times. Drabik testified that he considered both Daniels and himself to be experienced in working with contact trip pneumatic nailers.

Drabik had also heard of people being injured by contact trip nailers though he personally had never witnessed an injury. Drabik testified that he believed he and Daniels had at one time discussed the possibility of "people getting shot with [a nailer]." Tr. Vol. V at 988. In a deposition read into the record at trial as admissions at the close of defendants' case, Drabik gave the following testimony:

QUESTION: So you knew before your accident in May of 1987 that if you bumped into one of these nail guns, it could go off?

ANSWER: Yes.

[QUESTION:] Did you ever talk with Mr. Daniels about that situation; in other words, that if you bumped into one it could go off?

[ANSWER:] Yeah, you know, if you've got the trigger compressing and you bump into it, we're not talking mentality of—you don't have to have the mentality of Einstein to understand it. You pull the trigger, and you bump it, it goes off.

[QUESTION:] So that would be a matter of common sense to you?

ANSWER: I would say so, yeah.

Tr. Vol. VI at 1301.

Drabik acknowledged that workers on construction projects commonly carried contact trip nailers around with the trigger depressed regardless of whether they were actively nailing at the time. He testified:

[QUESTION:] And you also knew that as long as that person carried it around with the trigger depressed, if you bumped into anything, it could fire a nail?

ANSWER: Sure.

[QUESTION:] Did you ever complain to any other carpenter that you worked with who was using a pneumatic nailer like, you know, the same general design as the one that was involved in this accident, did you ever complain to them about walking around with the trigger depressed? I mean, did you ever say, hey, don't do that, that's not safe?

ANSWER: No.

QUESTION: Did you ever take any precaution yourself to stay away from someone; in other words, stay out of reach from someone who was walking around with a nailer with the trigger depressed because you knew that it might go off if it bumped somebody?

ANSWER: No, I can't say that I have.

Tr. Vol. VI at 1302–03.

In addition, prior to the accident, Drabik owned a Bostitch pneumatic roofing nailer, an N12B model, which had a contact trip. He read the operations manual and the warnings that were included when he purchased the N12B roofing nailer.

### D. Product History

Bostitch began marketing the N16 model nailer in 1970. The original operations manual described the two modes of operation, bump-firing and placement firing. Bostitch became aware that there had been some injuries from inadvertent actuation of contact trip nailers when users had carried the tool with the trigger depressed and accidentally

bumped into themselves or others.[2] Because Bostitch wished to minimize this potential for inadvertent actuation and it also wanted the product to be more accurate in its firing, it sought to redesign the nailer.

Initially, Bostitch altered the handle of the N16 nailer so that there would be more space for a user to grip the tool without having to place his finger on the trigger. However, this did not eliminate the risk of inadvertent discharge entirely. Bostitch then developed an alternative actuation method to the contact trip called the sequential trip. Unlike the contact trip, the sequential trip could only discharge a nail when used in placement firing mode. The conical piece at the tip of the nailer had to be depressed first and then the trigger squeezed to discharge a nail. With a sequential trip, the trigger must be pulled independently each time a nail is to be driven, thus the tool cannot be bump-fired with the trigger continually depressed. The sequential trip design provided two benefits: greater accuracy in placement of the nail and greater safety due to fewer instances of inadvertent actuation. Bostitch eventually received a patent for the sequential trip in 1974.

In 1972, Bostitch incorporated the sequential trip as its standard actuating design for the model N16 nailer. Bostitch discontinued sales of the contact trip. By May of 1972, Bostitch had sold a few hundred sequential trip nailers. At this time, Bostitch was receiving reports that users of the sequential trip nailers were personally modifying them to work as contact trips. Because in many cases such alterations were done improperly, Bostitch considered customer modification to be a dangerous practice. Accordingly, Bostitch began to manufacture kits containing parts which would allow the conversion to be done properly. Two memoranda from Bostitch managers accompanied the internal Bostitch change order that initiated the manufacture of the conversion kits. These memoranda indicated that the kits would allow customers to convert the sequential trip to a

contact trip and the users could be responsible for using them in the contact trip manner.

Soon thereafter, Bostitch discovered that it was selling more conversion kits than sequential trip nailers. In April 1973, Bostitch resumed marketing the contact trip nailer along with the sequential trip nailer. This decision was made by Bostitch's senior management in conjunction with its marketing division. Some of Bostitch's engineers expressed disagreement with the decision because of the perceived marketing and safety advantages of the sequential trip. In deciding to reintroduce the contact trip, Bostitch management considered the fact that they were selling more conversion kits than sequential trip nailers. Bostitch concluded that customers preferred the enhanced capability of the contact trip, bump-firing, to the added safety of the sequential trip design. Bostitch also was aware that its competitors were selling contact trip nailers. Bostitch continues to market both contact trip and sequential trip nailers to this day.

In June 1982, Peter Readyhough, Bostitch's National Service Manager, wrote a memo to Casey Antonio, Bostitch's Director of Engineering, describing the advantages and disadvantages of the contact trip versus the sequential trip. As advantages of the contact trip, Readyhough noted the greater speed and productivity that bump-firing allowed. Among the disadvantages of the contact trip, Readyhough acknowledged, "[o]perator's usual habit of using and carrying tools with trigger held actuated produces the possibility of driving a fastener into an object struck by mistake." Ex. 216 at 1. The memo also noted that Bostitch did not agree with the published ISANTA[3] standard which defined the contact trip as a safety mechanism. The memo stated, "[o]nly the sequential trip is considered to have a basic safety function; we do not use the word 'safety' in our descriptions of the conventional contact trip." Ex. 216 at 2.

---

**2.** At trial, Bostitch representatives characterized this as a misuse of the product, but admitted they were aware that these accidents were occurring.

**3.** ISANTA is an acronym for the International Staple, Nail, and Tool Association, a trade organization. Bostitch was an active member of ISANTA.

Drabik introduced evidence showing that Underwriters Laboratories, an independent product safety testing organization, objected to ISANTA's failure to adopt a standard with the American National Standards Institute requiring work contacting interlocks on contact trip nailers to prevent inadvertent actuation. Drabik introduced additional evidence to suggest that Bostitch had notice of such objections which were communicated in letters to ISANTA not only by Underwriter Laboratories, but also by another organization, Polytechnic, Inc.

In March 1984, Bostitch revised the operation and maintenance manual it furnished with the N16 model nailers. This manual explained the differences between bump-firing and placement firing and the contact trip versus the sequential trip. It discussed the speed advantages in bump-firing a contact trip model. The manual also stated: "The sequential trip nailer has a positive safety advantage because it will not accidentally drive a nail if the tool is contacted against the work—or anything else—while the operator is holding the trigger pulled." Ex. 238 at 2. The manual also contained several warnings, including the following:

Please study this manual before operating the nailer and understand the safety warnings and cautions.... NEVER place a hand or any other part of body in nail discharge area of tool while air supply is connected.... DO NOT CARRY the tool with the trigger depressed.... Never point tool toward anyone else.... Never pull trigger unless nose is directed toward the work.... WARNING: Do not carry contact trip model nailers with the trigger pulled, as serious injury could result if the "trip lever" is accidentally bumped against someone or something, causing the tool to fire.

Ex. 238 at 3, 4, 5 (capitalization in original).

At the time it was sold, the contact trip nailer involved in Drabik's injury was accompanied by this manual. In addition, at the time of sale, the nailer itself contained a label which read in part: "WARNING—TO PREVENT SERIOUS INJURY FROM FASTENERS AND FLYING DEBRIS: READ OPERATION MANUAL BEFORE USING TOOL." Ex. 239 (capitalization in original). In 1985, Bostitch affixed a new warning label on N16 model nailers. It stated in part: "WARNING—TO PREVENT SERIOUS INJURY FROM FASTENERS AND FLYING DEBRIS ... KEEP FINGER OFF TRIGGER WHEN NOT DRIVING FASTENERS." Ex. 239 (capitalization in original).

### III. THE TRIAL

#### A. Litigants' Theories

At trial, Drabik presented evidence in an attempt to show that the N16CT nailer was in a defective condition unreasonably dangerous for its reasonably anticipated uses. Drabik's experts testified that as a basic design engineering principle, any risk of serious injury or death is unreasonable if there are reasonable accident prevention means available to either eliminate or reduce the danger.

According to Drabik's experts, several factors contributed to the conclusion that the N16CT nailer was an unreasonably dangerous product. The weight, balance, and design characteristics of the nailer encourage the user to hold and carry the tool with the trigger depressed, thus elevating the danger of discharge through accidental contact. Drabik argued that the sequential trip design eliminated the danger without impairing the utility of the product. Because the nailer is expected to be used in an environment where many people are working together in a crew, the likelihood of accidental contact is high and warnings and instructions are ineffective solutions. Finally, Drabik maintained, the fact that Bostitch markets both a sequential trip and a contact trip does not detract from the dangerousness of the contact trip product.

Bostitch's experts countered that the contact trip nailer was a safe product. Bostitch argued that the contact trip offered significant speed and utility advantages versus the sequential trip. These advantages were borne out by customer demand. Bostitch maintained it took reasonable safety precautions and attached ample warnings to the product. Moreover, the N16CT was an industrial tool to be used by professionals.

The anticipated users were well aware that there was a danger of inadvertent discharge, just as there were risks associated with many power tools. The contact trip product was not unreasonably dangerous for its reasonable anticipated uses according to Bostitch's experts.

## B. Evidence of Other Injuries

Bostitch moved in limine to exclude evidence of other injuries occurring through the use of the N16 and other nailers. The district court denied the motion.

During Drabik's case in chief, Bostitch agreed to stipulate to certain facts concerning its notice of other injuries involving the N16CT nailer. Bostitch stipulated to having notice of four other occurrences prior to 1984 involving inadvertent discharge from an N16 contact trip nailer. These incidents were a head injury to Douglas Williams in August 1982, a knee injury to Brian Edmondson in October 1976, a foot injury to Gary Brewer in June 1978, and a leg injury to Morris Gatlin in February 1980. Bostitch agreed to stipulate to these cases after objecting to their admissibility for lack of substantial similarity. Bostitch explicitly stipulated without waiving its objection.

Edmondson later testified about the particular facts of his accident, again over Bostitch's objections for lack of substantial similarity. Also, an excerpt of Douglas Williams' prior testimony was read into the record over Bostitch's objections. Additionally, Drabik introduced evidence of two other injuries that occurred after the date of manufacture of the nailer at issue. Jason Wells and Curtis Moore both testified as to injuries they received after accidentally contacting an N16 contact trip nailer held by a co-worker. Bostitch did not object directly to either Wells' or Moore's testimony at the time they were offered.

The issue of other accident evidence also arose during the cross-examination of one of Bostitch's experts, Donald Wandling. During his direct examination, Wandling testified, "[t]he design of a machine or a machine system involves bringing all of our experiences to bear to design a product that's useful for us, of benefit to us, and that we can use safely." Tr. Vol. VI at 1186. He explained the differences in operation and utility between the contact trip and the sequential trip products. Wandling testified: "Either gun is safe in my judgment, and to market both or to market one is not a violation of any engineering principle." Tr. Vol. VI at 1194. He offered his opinion that the design of the nailer was not negligent and that it was suitable for use. He also stated, "[m]y opinion is that it was not defective, that it was suitable and proper, that it was reasonably safe." Tr. Vol. VI at 1204–05. Finally, Wandling opined that the nailer did not cause or contribute to cause Drabik's injury because the nailer simply did what it was designed to do and the discharge was accidental.

There was a side bar prior to Wandling's cross-examination. The trial judge discussed with the attorneys the possibility of testimony regarding other accidents. Bostitch objected to any attempt by Drabik to introduce other occurrence evidence without a showing of substantial similarity. The trial judge stated, "the objection is noted for the record, you [Bostitch's counsel] don't have to go through it all again, but I would go with you [Drabik's counsel] to some degree on this." Tr. Vol. VI at 1219.

On cross, Wandling testified affirmatively in response to leading questions that it was his opinion that the N16CT product and the design were generally safe. When asked whether he had had an opportunity to review the history of occurrences with N16 nailers, Wandling responded that he had not, except to the extent that information was contained in depositions he had reviewed prior to testifying. Drabik's attorney then asked Wandling whether he was aware of the injuries involving Wells and Moore which had already been presented to the jury. In the questions, the cross-examiner described the circumstances and the injuries received. Wandling said he was not familiar with either case.

The cross-examiner then asked whether Wandling was advised about an accident involving Robert Williamson in which an inadvertent bumping with a N5 coil nailer caused

a nail to be fired into his brain. Wandling said no. Wandling was asked whether he was advised about an accident involving Albert Schramm who was injured when a CN–65CT nailer held by a co-worker was inadvertently bumped causing a nail to be discharged into his head. Wandling said no. Wandling was also asked about injuries involving Lawrence Baier and Leland Kennison in which they themselves were operating N16CT nailers and had inadvertently discharged nails into their own bodies. Wandling testified he was not familiar with those events.

At that time, Bostitch objected again. The court ordered a recess during which there was a lengthy colloquy about the admissibility of other occurrence evidence. Drabik argued that this evidence was admissible for impeachment purposes because Wandling had testified that the product was generally safe and the evidence would serve to undermine the credibility of that opinion. Bostitch asserted that Drabik was attempting to use other accidents to prove defect, not notice (which had already been stipulated). For evidence of other accidents to be admissible, Bostitch maintained, there must be a showing of substantial similarity. Bostitch argued that there had been no showing of substantial similarity and Drabik's counsel was now attempting to show substantial similarity by placing hearsay evidence before the jury in the form of complaints filed in other cases.

The trial court allowed the questioning to continue over Bostitch's continued objection. The judge did not determine which, if any, of the other occurrences were substantially similar. The court did, however, limit Drabik in his questioning, to describing only the name of the injured party, the date the accident occurred, the part of the body injured, and the fact that it occurred through the inadvertent discharge of a contact trip nailer. When the jury was called back in, the judge gave a cautionary instruction. The court reminded the jury that statements of the lawyers are not proof of anything. He informed the jury that Drabik's counsel was asking these questions about other incidents only to see if Wandling had considered them in forming his opinion or if this additional information would alter his opinion. He also reminded the jury that Drabik's counsel was not proving the facts of any of the other instances to which he was referring.

After this cautionary instruction, Drabik's counsel continued his cross-examination. He handed exhibit 712A to Wandling. This exhibit was a summary of allegations compiled from lawsuit petitions and complaints filed against Bostitch. Drabik's counsel then asked Wandling whether he was familiar with the other nine incidents on the list. In his questioning, the cross-examiner was limited by the judge's admonitions and therefore did not discuss the events in any detail. In each instance, the witness said he had no specific knowledge of the occurrence. Exhibit 712A was not offered into evidence.

Drabik never produced any competent evidence to show whether these events were substantially similar. Many of these instances involved different model contact trip nailers than the N16CT.

Prior to trial, at the deposition of one of Bostitch's engineers, several exhibits were prepared relating to other nailer accidents. Drabik's counsel showed these exhibits (numbered 242 through 248) to Wandling and asked him whether he had reviewed these documents. Wandling denied having specific knowledge of the documents, though he said it was possible that they had been provided to him. He said he could not tell at that moment which ones he had seen and which ones he had not seen. Drabik later tried to introduce exhibits 242 through 248 into evidence. Bostitch objected on the grounds that these exhibits were hearsay and they had been used for impeachment purposes only and not as substantive evidence. The court sustained Bostitch's objections. During deliberations, the jury twice requested to see some of the exhibits, 242 through 248, that Drabik's attorney had referenced in his examinations.

### C. The Closing Argument

In his closing argument, Drabik's counsel referred to the other occurrence evidence. Counsel stated:

Well, let me tell you, I have no problem at all with corporations making a profit, and I

have no problem with corporations making money. What I have a problem with is them making it at the expense of other people. And that's what this corporation has chosen to do.

You see, they can't—and they acknowledge that in the beginning, that they didn't want to have responsibility for the injuries and damages. And ladies and gentlemen, they still don't.

You see what they want to do—Mr. Buchanan [Bostitch's counsel], you see, what the corporations want to do is they want to take all the profits, but they don't want to pay for any of the costs, do they. They don't want to pay the costs of the injuries, all the injuries that I talked about that Mr. Wandling didn't even consider, didn't even review and look at.

They don't want—and ladies and gentlemen, that's just Bostitch. We don't know how many other injuries there are. And those are just injuries where people have brought it to the attention of Bostitch. But you see, they don't want that.

They want you—what's the biggest problem we have now days? Health care cost. They want you all to pay them. They want all those medical expenses to go up and all those costs to be paid, but they don't want to have any of those costs included in their costs. That's what they're doing.

Tr. Vol. VII at 1434–35.

The case was submitted to the jury on Drabik's theory that the N16CT nailer was a defective product.[4] Bostitch offered a contributory fault instruction which the court refused. Bostitch moved at the close of Drabik's case and at the close of all the evidence for judgment as a matter of law. These motions were denied. The jury returned a verdict in favor of Drabik of $1.5 million in actual damages and $7.5 million in punitive damages. After the verdict, Bostitch renewed its motion for judgment as a matter of law, moved for a new trial, and moved for remittitur. The trial court denied all of Bostitch's motions.

**4.** Drabik dropped his initial negligent design

# IV. ANALYSIS

Bostitch makes five arguments on appeal: (1) Drabik failed to present a submissible case on his defective product theory and therefore Bostitch was entitled to judgment as a matter of law; (2) the district court erred in refusing to give a contributory fault instruction; (3) the district court erred in admitting evidence of other injuries; (4) punitive damages were not warranted in this case; and (5) in the event punitive damages are allowed, a remittitur is in order. The parties agree that Missouri substantive law applies in this case. We address the issues in turn.

## A. Submissible Case on § 402A

■ Since *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362 (Mo.1969), § 402A of the Restatement (Second) of the Law of Torts has been the basis for strict products liability in Missouri. This section imposes liability on a manufacturer who "sells any product in a defective condition unreasonably dangerous to the user or consumer" for physical harm caused to the ultimate user or consumer. Restatement (Second) of the Law of Torts § 402A (1965).

Bostitch urges this court to adopt the so-called consumer expectation test for what is unreasonably dangerous derived from comments to § 402A. Comment g reads, in part: "The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." *Id.* at comment g. Similarly, comment i states, in part: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.* at comment i. Bostitch argues that it is entitled to judgment as a matter of law because the risk of inadvertent discharge was well known to Drabik and Daniels and therefore the nailer was not unreasonably dangerous beyond their contemplation. Bostitch cites *Linegar v. Armour of Am., Inc.*,

claim prior to submission.

909 F.2d 1150 (8th Cir.1990), and other cases to support its argument.

In deciding whether judgment as a matter of law was appropriate, we must examine the entire record in the light most favorable to the non-movant. *Linegar*, 909 F.2d at 1152. Having done so, we cannot agree with Bostitch's contention.

The consumer expectation test is not clearly the standard for determining unreasonable danger in Missouri. The Missouri Supreme Court has written, "we have not yet formally incorporated, in any meaningful way, the Restatement's consumer expectation test into the lexicon of our product's liability law." *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 377 (Mo.1986) (en banc). The Missouri Supreme Court has been resistant to establishing a strict definition for the term unreasonably dangerous. *See id.; Hagen v. Celotex Corp.*, 816 S.W.2d 667, 673–74 (Mo. 1991) (en banc) (declining to define unreasonably dangerous in terms of a risk/utility test); *Lucas v. R.G. McKelvey Bldg. Co.*, 1992 WL 219182 at *7 (Mo.Ct.App. Sept. 15, 1992) ("[i]t is not evident what test a trial court should apply when determining whether a product is defective in design or whether summary judgment is ever appropriate in a design defect case"), *transferred to* 847 S.W.2d 806 (Mo.1993) (en banc). The practice established by Missouri state courts was to submit § 402A cases to the jury without a specific instruction as to what constitutes unreasonably dangerous and allow the jury to make the ultimate determination. *See Nesselrode*, 707 S.W.2d at 378; *Aronson's Men's Stores v. Potter Elec. Signal Co.*, 632 S.W.2d 472 (Mo.1982) (en banc). In this case, the jury instruction contained a broadly worded definition of unreasonably dangerous that was balanced as to both sides.[5] The instruction allowed the jury plenty of room to make the ultimate determination of fact.

■ Drabik cites to the court many examples of submissible design defect cases including *Nesselrode*, 707 S.W.2d 371; *Keener*, 445 S.W.2d 362; *Blevins v. Cushman Motors*, 551 S.W.2d 602 (Mo.1977) (en banc); and *Jarrell v. Fort Worth Steel & Mfg. Co.*, 666 S.W.2d 828 (Mo.Ct.App.1984). Given these precedents and viewing the evidence in the light most favorable to Drabik, we conclude that the district court properly denied Bostitch's motion for judgment as a matter of law.

**B. Contributory Fault Instruction**

■ Bostitch next argues that it was entitled to its requested instruction on contributory fault. A party is entitled to have its theory of the case presented to the jury if there is evidence, direct or circumstantial, to support the claim or defense and a request is brought to the court's attention. *See Roth v. Black & Decker, U.S., Inc.*, 737 F.2d 779, 784 (8th Cir.1984); *Haines v. Powermatic Houdaille, Inc.*, 661 F.2d 94, 96 (8th Cir.1981). The evidence must be examined in the light most favorable to the party proposing the instruction, giving it the benefit of all reasonable, favorable inferences. *Hallberg v. Brasher*, 679 F.2d 751, 757 n. 6 (8th Cir. 1982).

■ Contributory fault is a complete defense to a strict products liability action in Missouri. *Peterson v. Auto Wash Mfg. & Supply Co.*, 676 F.2d 949, 952 (8th Cir.1982); *Trejo v. Keller Indus., Inc.*, 829 S.W.2d 593, 599 (Mo.Ct.App.1992). The defense of contributory fault requires the defendant to prove that the plaintiff knew of the facts which create the danger, the plaintiff appreciated the danger and voluntarily and unreasonably exposed himself to a known risk, and the plaintiff's conduct directly caused or contributed to cause any damage plaintiff may have sustained. *Peterson*, 676 F.2d at 952 n. 4; *Vanskike v. ACF Indus., Inc.*, 665 F.2d 188, 204 (8th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *Boyer v. Eljer Mfg., Inc.*, 830 S.W.2d 535, 539 (Mo.Ct.App.1992). The danger must be open

---

**5.** Jury Instruction No. H2 stated: "The phrase 'unreasonably dangerous' means unreasonable exposure to a risk of serious injury or death to the consumer or user given the conditions and circumstances that will foreseeably attend the use of the product. In determining if a product is unreasonably dangerous, you may consider whether or not there are means available to the manufacturer to either eliminate or reduce exposure to a risk of serious injury or death, balanced against any impairment in the utility or cost of the product."

and obvious and the plaintiff must nevertheless proceed unreasonably to make use of the product. *Boyer,* 830 S.W.2d at 539; *Williams v. Pro–Tec, Inc.,* 908 F.2d 345, 347 (8th Cir.1990).

■ The danger to which the plaintiff unreasonably exposes himself must be the danger which is submitted in the plaintiff's instructions. *Arnold v. Ingersoll–Rand Co.,* 834 S.W.2d 192, 195 (Mo.1992) (en banc). A defendant need not show that the plaintiff had knowledge of the precise engineering defect in order to show contributory fault; rather, it is enough that the plaintiff knew there was a problem with the product that made it dangerous to use. *Williams,* 908 F.2d at 347; *Boyer,* 830 S.W.2d at 539. In essence, a plaintiff knew of the danger as submitted in plaintiff's instructions if the plaintiff "knew that the product posed a significant risk of causing the calamity submitted in the plaintiff's case." *Arnold,* 834 S.W.2d at 196. The Missouri courts have tended to treat the contributory fault issue on a case-by-case approach based on the plaintiff's experience. *Id.*

■ We hold that Bostitch should have received the benefit of a contributory fault instruction in this case. The danger at issue here is the potential for inadvertent actuation by accidental contact between the nailer's contact trip and Drabik's head while the trigger was depressed. That is the calamity forming the basis of Drabik's case. Drabik himself testified that he had considerable experience with contact trip nailers, he was fully aware of how they worked, and he had knowledge of other people being accidentally injured by them in the precise way in which he was injured. He testified directly that he knew if one accidentally bumped the contact trip while the trigger was depressed, the nailer would discharge. Many cases from the Missouri courts and from this court interpreting Missouri law have allowed contributory fault instructions in situations where plaintiffs had similar or even lesser knowledge than Drabik had. *See, e.g., Williams,* 908 F.2d at 347 (experienced racquetball player could properly have been found to have knowledge of risk of eye injury despite using lensless eye guard); *Peterson,* 676

F.2d at 952 (plaintiff had previously read instructions and used car wash equipment which caused injury and understood that water was pressurized); *Vanskike,* 665 F.2d at 204 (plaintiff, attempting to elevate a jammed trailer hitch on railroad flatcar by striking it with hammer, knew that hitch could fall); *Arnold,* 834 S.W.2d at 196 (plaintiff's knowledge of potential explosion caused by use of machine causing sparks in presence of accumulated gas fumes could be inferred); *Trejo,* 829 S.W.2d at 599 (plaintiff who had failed to check to see if ladder locks were engaged knew of danger of using ladder unlocked); *Stang v. Deere & Co.,* 796 S.W.2d 908, 914–18 (Mo.Ct.App.1990) (experienced operator of backhoe, with knowledge of lack of rollover protection, could have been contributorily at fault for trying to extricate machine from trench on slope); *Harper v. NAMCO,* 765 S.W.2d 634, 637–38 (Mo.Ct.App.1989) (plaintiff, whose clothes were caught in machinery of silage wagon, had admitted knowledge that he could be injured if arm or leg were caught in machinery).

According to the trial court, despite Drabik's general knowledge of the danger of inadvertent actuation, a contributory fault instruction was unwarranted because "it would be speculative to guess whether plaintiff might have realized he and Daniels were positioned so that he was within a dangerous range of the nailer being held by Daniels." *Drabik v. Stanley–Bostitch, Inc.,* 796 F.Supp. 1271, 1276 (W.D.Mo.1992).

We think that the district court erred on this point. In light of the existing precedents discussing when a contributory fault instruction was merited, we cannot agree with the district court that Drabik needed to have such specific knowledge that his head was in the precise range of the nailer. The test is whether Drabik had knowledge "that the product posed a significant risk of causing the calamity submitted in the plaintiff's case." *Arnold,* 834 S.W.2d at 196. The calamity that was the foundation of the plaintiff's case was inadvertent discharge through accidental bumping of the contact trip while the trigger was depressed. Bostitch proved that Drabik did have knowledge of that risk.

The trial court felt that it would be speculative to attribute sufficient knowledge to Drabik to determine whether he had voluntarily encountered a known risk. We disagree. There was no speculation that Drabik knew of the danger of inadvertent actuation caused by accidental contact. Furthermore, there was no speculation that Drabik knew Daniels was operating the tool in bump-fire mode when Drabik looked underneath the top plate. Drabik's conduct in light of his knowledge creates a jury question. There was evidence presented that this particular task could have been accomplished in other, safer ways. The work could have been done with the side wall laying flat instead of standing up. The men could have been positioned on opposite sides of the work. Daniels could have operated the nailer in placement rather than bump-firing mode. Given the undisputed quantum of Drabik's knowledge of the danger, the jury should have been allowed to determine for itself whether Drabik voluntarily and unreasonably accepted the risk by working in the manner he did.

### C. Other Injury Evidence

Bostitch maintains that it was unduly prejudiced by the admission of evidence involving other injuries allegedly caused by pneumatic nailers. Specifically, Bostitch argues that the court erred in admitting evidence of the injuries to Edmondson, Williams, Moore, and Wells. Bostitch also contends that the trial court improperly allowed Drabik to refer to other accidents while cross-examining Wandling.

 Evidence of other accidents may be relevant to the defendant's ability to correct known defects, the magnitude of the danger, the lack of safety for intended uses, or causation. *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 625 (8th Cir.1983). It can also prove notice of the existence of defects. *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1108 (8th Cir.1988). However, evidence of other injuries may also raise extraneous controversial points, lead to a confusion of issues, and present undue prejudice disproportionate to its usefulness. *Trejo*, 829 S.W.2d at 596 (citing *Jones v. Terminal R.R. Ass'n of St. Louis*, 242 S.W.2d 473,

477 (Mo.1951), and 2 Wigmore Evidence, §§ 442–443, 458). For other accident evidence to be admissible, the proponent of the evidence must show that the facts and circumstances of the other incident are substantially similar to the case at bar. *Lewy*, 836 F.2d at 1108. The admissibility of other accident evidence is within the discretion of the trial court and its decisions will not be disturbed unless there is a clear and prejudicial abuse of discretion. *Roth*, 737 F.2d at 783.

Having reviewed the record, this court takes no issue with the district court's conclusion that the injuries to Williams, Moore, and Wells occurred under substantially similar circumstances so as to warrant their admission into evidence to support Drabik's theory of the case. We are less convinced that the injury to Edmondson was substantially similar. If the Edmondson evidence were the only other separate accident evidence admitted, this court could defer to the trial court's broad discretion and hold that there was not enough prejudicial effect as to warrant significant discussion (especially since Bostitch had already stipulated to the Edmondson accident for notice purposes). However, there was a vast amount of additional other occurrence evidence that was allowed in besides just these four cases. The cumulative effect of all of this other evidence, in our view, had a considerable unfair prejudicial effect on the jury.

 The other evidence which troubles us was introduced on cross-examination of Wandling. There was no showing that these other accidents occurred under substantially similar circumstances. In fact, at least some of the accidents described involved products other than the N16CT nailer. Drabik argued that this other accident evidence was relevant and admissible to impeach Wandling's conclusion that the N16CT nailer was "generally safe." For support of this position, Drabik relies on *Hale v. Firestone Tire & Rubber Co.*, 820 F.2d 928 (8th Cir.1987), and *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103 (9th Cir.1991).

In *Hale*, an expert for the defendants had given "vast and comprehensive testimony" as to the safety of the product involved. *Hale*,

820 F.2d at 935. Both the direct testimony and the cross-examination took over 100 pages of transcript each. *Id.* at 934. The other occurrence evidence was referred to only briefly in the cross-examination. *Id.* at 935. The court considered all the circumstances and concluded "[t]his evidence was proper for impeachment purposes under the facts of this case." *Id.* The *Cooper* court read *Hale* to stand for the broad proposition that "[w]hen an expert testifies that a product is generally safe, as appellant's experts did, the witness's credibility can be undermined by showing the witness had knowledge of prior accidents caused by the product." *Cooper,* 945 F.2d at 1105.

We think this case is distinguishable from *Hale* and we do not agree with the expansive interpretation taken by the *Cooper* court. Wandling in this case testified that in his opinion, the N16CT nailer was "not defective ... suitable and proper ... [and] reasonably safe." He acknowledged that the gun had operated as designed when it inadvertently discharged a nail after being bumped. His assent that the nailer was "generally safe" was in response to a leading question by Drabik's counsel on cross-examination. We do not think this testimony rises to the level of "vast and comprehensive" necessary to permit non-similar accident evidence for impeachment purposes. Furthermore, in *Hale* the other accident evidence was a minute portion of the cross-examination. In this case, the other accident evidence formed the crux of the cross-examination. We note that the *Hale* court specifically limited its holding to "the facts of this case" and we see great danger in over-interpreting this limited exception.

Wandling was indisputably engaged by the defendant Bostitch to conduct a study and render an opinion about the N16CT nailer. He was testifying as to his opinions, and any qualified expert must be entitled to do that without having to rebut extraneous evidence of dissimilar accidents. *See Johnson v. Ford Motor Co.,* 988 F.2d 573, 580 n. 6 (5th Cir. 1993) (holding evidence of dissimilar accidents did not impeach expert's testimony about specific mechanical feature); *Freund v. Fleetwood Enters., Inc.,* 956 F.2d 354, 360 (1st Cir.1992) (holding cross-examination about other products was improper absent foundation of substantial similarity); *Wheeler v. John Deere Co.,* 862 F.2d 1404, 1409 (10th Cir.1988) (holding evidence to impeach testimony must be limited to substantially similar accident evidence); *Peterson,* 676 F.2d at 953 (holding an earlier accident offered to impeach testimony was properly excluded due to lack of substantial similarity).

To hold that an expert who simply offers his opinion that a product is "generally safe" opens the door to all other accident evidence would create an exception which would swallow the general rule. An expert would not be able to render an opinion without having to address a litany of other accidents that may or may not be even remotely like the accident at issue. This simply places too big a burden on defendants. The general rule of limiting the admission of other accident evidence to those events which were substantially similar ensures that the focus of the trial stays on the specific type of accident forming the basis of the case.

The prejudice created by generous admission of dissimilar accident evidence was manifest in this case. Twice the jury requested to see the documents describing the other occurrences. These requests were denied because these lists had never been sufficiently substantiated so as to allow admissibility. The jury obviously was concerned about the other injuries, though most of the events had not ever been shown to be substantially similar. Also, in his closing argument, Drabik's counsel was able to allude to this other accident evidence which arguably inflamed the jury and contributed to its large punitive damages award.

We hold that the district court abused its discretion by admitting such extensive evidence of other injuries. On retrial, admission of other occurrence evidence should be more closely controlled. *Hale* must be confined to its unique facts and because this case is readily distinguishable from *Hale,* impeachment evidence involving other injuries should be limited to those which are substantially similar.

## D. Punitive Damages

Finally, Bostitch contends it was entitled to judgment as a matter of law on the issue of punitive damages. In determining submissibility of punitive damages, we examine the entire record in the light most favorable to the plaintiff. *Roth,* 737 F.2d at 781. Judgment as a matter of law should be granted when "all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." *Dace v. ACF Indus., Inc.,* 722 F.2d 374, 375 (8th Cir.1983) (citations omitted).

The test for punitive damages in Missouri is a strict one. *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392, 397 (Mo. 1987) (en banc). A plaintiff must establish: (1) the defendant placed an unreasonably dangerous product in commerce with knowledge of its defective condition; (2) the defendant showed complete indifference to or utter disregard for the safety of others; and (3) the defendant acted with some degree of wantonness or bad motive. *See Sutherland v. Elpower Corp.,* 923 F.2d 1285, 1290–91 (8th Cir.1991); *Roth,* 737 F.2d at 781; *Vanskike,* 665 F.2d at 208–09. For punitive damages to be warranted, the defendant must be aware of unreasonable danger, not just any danger. *Racer v. Utterman,* 629 S.W.2d 387, 397 (Mo. Ct.App.1981), *cert. denied,* 459 U.S. 803, 103 S.Ct. 26, 74 L.Ed.2d 42 (1982). Moreover, punitive damages are not appropriate for exaggerated negligence, inadvertence or bungling; there must be some element of outrageous conduct. *Bhagvandoss,* 723 S.W.2d at 397.

We conclude that punitive damages were unwarranted in this case and Bostitch is entitled to judgment as a matter of law. In our view, the evidence is only susceptible to this result. We base this conclusion on several factors.

The evidence clearly shows that when Bostitch became aware of the inadvertent discharge problem, it immediately took steps to make the product safer. These steps included altering the handle design to make it easier to carry without holding down the trigger, introducing the sequential trip actua-

tion device (which consumers did not prefer, but which Bostitch continued to market), and including specific and explicit warnings in the operation manual and on the nailer itself. *See Lockley v. Deere & Co.,* 933 F.2d 1378, 1389–90 (8th Cir.1991) (evidence of measures taken to improve design and provide warnings for allegedly defective product negates inference of indifference to consumer safety). These actions are not consistent with a company that is "completely indifferent" to the safety of others. That these efforts did not prevent all injuries is not the issue. *See Bhagvandoss,* 723 S.W.2d at 398 (holding that inadequate warnings cannot be equated to conscious disregard). The point is that these actions belie an outrageous, wanton disregard for user safety which would support a punitive damages award.

At the time of manufacture, the contact trip design was the standard in the industry, and it continues to be the standard today. This is also relevant to show that Bostitch was not willfully indifferent. Compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind with no knowledge of a dangerous design defect. *Lane v. Amsted Indus., Inc.,* 779 S.W.2d 754, 759 (Mo.Ct.App.1989). In fact, Bostitch went beyond industry standards in many respects. Bostitch developed and patented the sequential trip mechanism for the express purpose of increased safety. Bostitch did not agree with ISANTA's description of the contact trip as purely a safety mechanism and it did not disingenuously stress safety in its contact trip marketing. Rather, in its owner's manuals for its N16CT nailers, Bostitch expressly acknowledged the increased risks that improper use of the contact trip design entailed and provided ample instruction and warnings to promote safe use.

Drabik maintains that any attempt to continue marketing the N16CT is outrageous in light of the safer sequential trip alternative. This argument fails, though, and this marketing decision should not be held against Bostitch. This court has clearly established that "[a] manufacturer is not obliged to market only one version of a product, that being the

very safest design possible." *Linegar,* 909 F.2d at 1154. Bostitch's efforts to develop and market a safer alternative for its customers who prefer it demonstrate that it was concerned about consumer safety, not that it was utterly indifferent.

Drabik points out that some of Bostitch's own engineering personnel objected to reintroducing the contact trip because of safety concerns. Drabik also highlights the objections to the lack of safety interlocks on the contact trip design which were made to ISANTA. However, disagreement, either internal or industry-wide, about a product's degree of safety does not in itself compel punitive damages. Absent an indication of complete indifference and an element of outrage, punitive damages are inappropriate. *Bhagvandoss,* 723 S.W.2d at 397.

Finally, in addressing punitive damages, we must consider Bostitch's assessment of the N16CT's risk in conjunction with its assessment of the tool's utility. Many products, such as knives or propellers, have a degree of danger which is outweighed by their utility. *See Pree v. Brunswick Corp.,* 983 F.2d 863, 868 (8th Cir.1993), *petition for cert. filed,* 61 U.S.L.W. 3805 (U.S. May 12, 1993) (No. 92–1836). When Bostitch began remarketing contact trip nailers in 1973, it knew of the contact trip design's risk of accidental discharge. However, it also knew that only the contact trip design offered the capability of bump-firing. Bostitch had to weigh the greater utility of bump-firing versus the risk of accidental discharge.

The instances of accidental discharge that Bostitch considered were, in the words of the district court, "rare," and injury usually occurred "when there is some inadvertence on the part of nail handlers and their companions." *Drabik,* 796 F.Supp. at 1274. On the other hand, Bostitch presented ample evidence to support its belief that the contact trip provides enhanced utility in many applications. Bostitch's engineers testified to the additional capabilities and the evidence of greater utility was borne out by customer demand. The company had focused its marketing efforts exclusively on the admittedly safer, but more limited, sequential trip design for one year. Rather than embracing

the sequential trip design as a safer alternative, Bostitch's customers demonstrated such a strong preference for the contact trip product that they were personally modifying sequentials to work as contact trips. To Bostitch, this reasonably confirmed its existing belief that customers perceived the increased utility as outweighing the risks. Moreover, by reintroducing the contact trip nailer, Bostitch was able to minimize the potentially dangerous practice of consumer modification.

While customer demand cannot make a dangerous product safe, it does communicate to the manufacturer that users want certain capabilities even in the face of slightly increased risks. In this sense consumer demand is highly relevant to the manufacturer's state of mind and is probative to the issue of punitive damages. Bostitch, along with the rest of the nailer industry, believed contact trip nailers to be reasonably safe. Bostitch's customers showed an overwhelming preference for the contact trip design. We find it unacceptable to find that Bostitch's actions in marketing its nailer products were outrageous in light of its own assessment of the risks and customer demand.

Taking the evidence as a whole and viewing it in the light most favorable to Drabik, we are simply unable to conclude that Bostitch acted in complete disregard for the safety of others in an outrageous, wanton manner. Bostitch is entitled to judgment as a matter of law on the issue of punitive damages.

## V. CONCLUSION

For the foregoing reasons, we vacate the jury's award and remand this case for a new trial on the issues of liability and compensatory damages.