1 F.3d 1244
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Paul MONTGOMERY, Plaintiff-Appellee,
v.
STANLEY-BOSTITCH, INCORPORATED, a Division of Stanley-Works,
Defendant-Appellant.
 No. 92-3018.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 17, 1993.
Decided Aug. 11, 1993.
 
 1
 Before RIPPLE and MANION, Circuit Judges, and SHADUR, Senior District Judge.*
 
 ORDER
 
 2
 While remodeling a house, Paul Montgomery ("Montgomery"), a carpenter, accidently shot himself in his leg with a nail fired from a pneumatic nailer manufactured by Stanley-Bostitch ("Stanley"). Montgomery sued Stanley, and the jury awarded him $500,000.00. Stanley appeals, contending that Montgomery incurred the risk of his injury and that his version of how the accident occurred is contrary to the physical facts established at trial. We affirm.
 
 I.
 
 3
 The Stanley pneumatic nailer (model N-80-C-1) resembles a hand-held power drill. It is activated by compressed air, attached to the nailer by way of a hose. To fire the nailer, a user must do two things, the order of which does not matter: first, press the barrel of the nailer against a surface, depressing the "contact trip," a spring-loaded device at the nose of the barrel; second, pull the trigger. Once those two steps are taken, the nailer fires a nail at a speed of about seventy-five miles per hour.
 
 
 4
 In June 1988, Montgomery was standing on the pitched lower roof of a bi-level house in Nashville, Indiana, nailing wood to the vertical side of the house with a N-80-C-1 nailer. Montgomery was familiar with the operation of the nailer, having used it in the past. Two men stood on the ground helping Montgomery that day. One cut the wood in accordance with Montgomery's measurements, and the other handed the wood up to him. While waiting for his co-worker to cut a piece of lumber, Montgomery sat on the narrow lower roof. He placed the nailer, barrel down, on his right leg, just above his knee, and rested the body of the nailer against the side of the house. Montgomery reached for the nailer, "brushed" its trigger, and fired a three and one-quarter inch nail into the femur of his right leg. He did not touch the nailer in any other way besides "brushing" the trigger. With the nail imbedded deep in his leg, Montgomery screamed in pain and threw the nailer to the ground. His co-workers helped him down from the roof and brought him to a nearby hospital. Surgeons removed the nail and placed a cast on Montgomery's injured right leg.
 
 
 5
 Montgomery sued Stanley in a Brown County, Indiana, Circuit Court. Stanley removed the lawsuit to the United States District Court for the Southern District of Indiana, based on diversity jurisdiction. Montgomery won at trial, with the jury awarding him $500,000.00. Although during the trial Stanley did not move for a directed verdict, it did move for a new trial after the jury's verdict. The district court denied the motion for a new trial, and Stanley filed this timely appeal.
 
 II.
 
 6
 We have jurisdiction, 28 U.S.C. Sec. 1291, to consider the two issues Stanley raises: (1) whether Montgomery incurred the risk of his injury, and (2) whether the physical facts established at trial conflict with Montgomery's testimony regarding how the accident took place.
 
 A.
 
 7
 Because the district court's jurisdiction over this lawsuit was based on the diversity of the parties' citizenship, 28 U.S.C. Sec. 1332, the choice of law rules of the forum state, in this case Indiana, apply to the issues Stanley raises. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). As the parties agree, because the accident occurred in Indiana, Indiana law governs the issues Stanley brings on appeal. See Hubbard Mfg. Co. v. Greeson, 515 N.E.2d 1071, 1073-74 (Ind.1987). Nevertheless, federal law, and not Indiana law, controls our review of the district court's ruling on the motion for a new trial. Blumenfeld v. Stuppi, 921 F.2d 116, 118 (7th Cir.1990); Davis v. FMC Corp., 771 F.2d 224, 232 (7th Cir.1985). In considering the district court's decision, our standard of review "is extremely limited because of [the district court's] superior ability, by virtue of having observed the jury at first hand, to assess its fairness and competence." Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963, 971 (7th Cir.1983). We will, consequently, reverse a district court's ruling on a motion for a new trial only where the district court clearly abused its discretion. Blumenfeld, 921 F.2d at 118; see also Rogers v. ACF Indus., Inc., 774 F.2d 814, 818 (7th Cir.1985) ("Absent a motion for a directed verdict, this Court will not reverse a district court for denial of a new trial on the basis that the verdict was against the weight of the evidence unless such a denial constituted an abuse of discretion."). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." Harrington v. DeVito, 656 F.2d 264, 269 (7th Cir.1981), cert. denied, 455 U.S. 993 (1982).
 
 B.
 
 8
 Stanley first argues that the district court abused its discretion in denying its motion for a new trial because the evidence at trial failed to support the jury's finding that Montgomery did not incur the risk of his injury. Stanley maintains that for Montgomery to have fired the nailer, two acts had to have occurred: the contact trip needed to be depressed and the trigger pulled. Stanley asserts that Montgomery was familiar with the use of the nailer, having used it in the past, but nevertheless acted unreasonably by placing the barrel of the loaded nailer directly on his right leg. According to Stanley, Montgomery had to have applied pressure on the nailer--thus depressing the contact trip--for the nailer to have fired when he "brushed" the trigger with his hand. In short, Stanley maintains that Montgomery's pressing down on the nailer, while it was on his leg, was an unreasonable act, and, therefore, he incurred the risk of his injury.
 
 
 9
 The Indiana Products Liability Act ("the Act"), Ind.Code Secs. 33-1-1.5-1 to 33-1-1.5-8, governs Montgomery's strict liability claims against Stanley. Under the Act, a defense to a strict liability claim is that the plaintiff incurred the risk of his injury:[1] "It is a defense that the user or consumer bringing the action knew of the defect and was aware of the danger and nevertheless proceeded unreasonably to make use of the product and was injured by it." Id. Sec. 33-1-1.5-4(b)(1). "Generally, incurred risk is a question of fact for the jury." Mauller v. City of Columbus, 552 N.E.2d 500, 502 (Ind.Ct.App.1990). " 'Incurred risk can be found as a matter of law only if the evidence is without conflict and the sole inference to be drawn is that the plaintiff (a) had actual knowledge of the specific risk, and (b) understood and appreciated the risk.' " Id. at 502-03 (quoting Stainko v. Tri-State Coach Lines, Inc., 508 N.E.2d 1362, 1364 (Ind.Ct.App.1987)). "The incurred risk defense requires not 'merely a general awareness of the potential for mishap, but ... demands a subjective analysis focusing on the plaintiff's actual knowledge and appreciation of the specific risk involved and voluntary acceptance of that risk.' " Id. at 503 (quoting Get-N-Go, Inc. v. Markins, 544 N.E.2d 484, 486 (Ind.1989)); accord Kroger Co. v. Haun, 379 N.E.2d 1004, 1008 (Ind.Ct.App.1978). " 'By definition ... the very essence of incurred risk is the conscious, deliberate and intentional embarkation upon a course of conduct with knowledge of the circumstances.' " Mauller, 552 N.E.2d at 503 (quoting Power v. Brodie, 460 N.E.2d 1241, 1243 (Ind.Ct.App.1984)).
 
 
 10
 In its special verdict, the jury made several findings, including that the nailer was defective and unreasonably dangerous, that Montgomery did not know or understand the risk associated with the use of the nailer, and that Montgomery did not misuse the nailer. The jury was not asked in the special verdict to explain in what manner the nailer was defective.
 
 
 11
 At trial, Montgomery defined the defect as a failure to prevent accidental or inadvertent discharge by the user of the nailer. Stanley maintained that the nailer was not defective. In its motion for a new trial, Stanley did not challenge the jury's finding of a defect as against the weight of the evidence and did not offer an alternative way in which the nailer could have been defective. In considering the motion for a new trial, the district court determined that the jury's finding of a defect had to have been the one Montgomery advanced, the only theory of defect before the jury. We agree with the district court's conclusion.
 
 
 12
 Montgomery's expert testified at trial that the nailer had the following design flaws: the contact trip spring was weaker than it should have been; the trigger was sensitive and "too easy to energize accidently" (that is, it was a "hair trigger"); the trigger lacked a safety guard; the design of the gun made it too easy for a user to hit the trigger accidentally with his finger while lifting the nailer; and the trigger lacked a locking mechanism to prevent inadvertent or accidental discharge. The expert testified that the design flaws caused the defect of accidental or inadvertent firing and that the defect was the proximate cause of Montgomery's injury. The jury also heard Montgomery testify that he did not press down on the nailer when it fired the nail into his right leg; he only "brushed" the trigger with his hand.
 
 
 13
 Owing to the jury's finding of a defect in the nailer, we conclude that the district court did not abuse its discretion in denying Stanley's motion for a new trial. The district court's ruling that Montgomery did not incur the risk of his injury was reasonable in light of the evidence presented at trial. That evidence does not lead to the sole inference that Montgomery incurred the risk of his leg injury. As a result, whether Montgomery incurred the risk is a question of fact for the jury and is not a question of law for this court. Mauller, 552 N.E.2d at 502-03.
 
 
 14
 For Montgomery to have incurred the risk, he would have needed to have had actual knowledge and an appreciation of the specific risk involved in using the defective nailer; he would have also needed to have voluntarily accepted that risk. Id. at 503; see also Kroger Co., 379 N.E.2d at 1008 ("Incurred risk demands a subjective analysis with inquiry into the particular actor's knowledge and voluntary acceptance of the risk."). Montgomery testified, however, that the nailer had never before fired inadvertently as it did when he was injured, that is, firing after the trigger was "brushed," but the nailer not otherwise touched or pressed down. He also testified that he never heard, nor expected, that the nailer could so fire. In addition, although Montgomery may have been careless in his placement of the nailer, barrel down, on his right leg, carelessness is not enough to constitute incurred risk. Id. ("Incurred risk involves a mental state of 'venturousness'...."); see also Mauller, 552 N.E.2d at 503 (noting that incurred risk requires an intentional embarkation on a course of conduct with knowledge of the circumstances). As such, we affirm the district court on this issue. The district court's decision to deny the motion for a new trial was reasonable and was, therefore, not an abuse of discretion. Rogers, 774 F.2d at 818.[2]
 
 C.
 
 15
 Next, Stanley argues that the district court abused its discretion in denying its motion for a new trial because Montgomery's explanation of how the nailer fired is contrary to the physical facts of record. Stanley claims that Montgomery's testimony runs counter to the established physical facts that the nailer could fire only if the trigger were pulled and the contact trip depressed. Montgomery testified that the nailer fired after he "brushed" the trigger with his hand, and without him touching the nailer in any other way. Stanley contends that Montgomery's version of the incident leads to only one inference: that the weight of the nailer caused the depression of the contact trip; yet, Stanley maintains that the undisputed testimony established that it was impossible for nothing more than the weight of the nailer to depress the contact trip spring.
 
 
 16
 According to the Indiana court the "physical facts" rule comes into play when "the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value and a jury is not permitted to rest its verdict thereon." Zollman v. Symington Wayne Corp., 438 F.2d 28, 31-32 (7th Cir.) (quoting Connor v. Jones, 59 N.E.2d 577, 581 (Ind.Ct.App.1945)), cert. denied, 404 U.S. 827 (1971). The "physical facts" rule "applies only when the physical facts are irrefutably established and permit but one inference. To arrive at conclusions from physical facts alone, however, is often hazardous." Brock v. Walton, 456 N.E.2d 1087, 1092 (Ind.Ct.App.1983).
 
 
 17
 The "physical facts" rule is not applicable to this case. The evidence was not irrefutable regarding the amount of force needed to depress the contact trip, which Montgomery's expert described as having a spring that was "too weak." No quantitative measurement was made about the amount of force needed to depress the contact trip. Instead, terms such as "bump" and "bounce" were used to describe the force a user needed to apply to depress the contact trip. Montgomery's expert also testified, among other things, that the nailer could "be energized without much conscious effort at all."
 
 
 18
 With regard to a way in which the jury could have determined how Montgomery injured himself, Montgomery provides a plausible explanation. He states that based on the evidence presented at trial, one can reasonably assume that the jury could have concluded that when he placed the nailer on his leg, he could have unknowingly done so with sufficient force to have depressed the contact trip. (Friction was one of the four components that attributed to the amount of force needed to press down the contact trip.) Then, by Montgomery placing the nailer against the side of the house, the nailer resting in that position could have kept the contact trip in the depressed position. When Montgomery reached for the nailer and "brushed" its trigger, which both he and his expert described as a "hair trigger," the nailer would have fired. Thus, the two steps Stanley maintains were needed to fire the nailer took place: the contact trip was depressed and the trigger pulled. We conclude, as such, that the district court did not abuse its discretion in denying Stanley's motion for a new trial on this ground. Rogers, 774 F.2d at 818 ("Absent a motion for a directed verdict, this Court will not reverse a district court for denial of a new trial on the basis that the verdict was against the weight of the evidence unless such a denial constituted an abuse of discretion.").
 
 III.
 
 19
 The district court did not abuse its discretion in denying Stanley's motion for a new trial, and the district court is AFFIRMED.
 
 
 
 *
 Hon. Milton I. Shadur, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 According to the Indiana courts, incurred risk differs from assumed risk, if at all, in that assumed risk arises where a contractual obligation is present. E.g., Kroger Co. v. Haun, 379 N.E.2d 1004, 1008 n. 2 (Ind.Ct.App.1978)
 
 
 [2]
 In a recent case, Drabik v. Stanley-Bostitch, Inc., No. 92-3246, 1993 WL 258359 (8th Cir. July 14, 1993), the jury verdict against Stanley was vacated and a new trial ordered. In that case, Leonard Drabik was helping a friend build a storage shed. Drabik bent down to line up a stud, while the friend secured it with nails shot from a Stanley nailer. When Drabik stood up, his head hit the contact trip. The friend still had the trigger depressed, and a nail was fired into Drabik's brain. The injury was not mortal. Our case differs from Drabik in several respects, mainly in that there was no evidence in Drabik of either a manufacturing defect or a product malfunction