**Sandra Elaine TAYLOR, as personal representative of the Estate of Randel M. Taylor, Deceased, Plaintiff,**

v.

**GENERAL MOTORS, INC., Defendant.**

Civ. A. No. 77–94.

United States District Court,
E. D. Kentucky,
Covington Division.

April 26, 1982.

Otto Daniel Wolff, Covington, Ky., for plaintiff.

Edward J. Utz, Cincinnati, Ohio, for defendant.

## OPINION AND ORDER

BERTELSMAN, District Judge.

This unusual products liability action, which resulted in a jury verdict for the defendant, is before the court on the plaintiff's motion for a new trial. The motion challenges the court's refusal of plaintiff's tendered instruction based on the doctrine of strict products liability, particularly the aspects of that doctrine concerned with warnings. In support of the motion plaintiff cites several cases not previously brought to the court's attention. After careful consideration the court is convinced that plaintiff was entitled to the requested instructions and that the court's refusal to give them was prejudicial. Therefore, the motion for new trial must be granted.

On August 14, 1976, the plaintiff's decedent, Randel M. Taylor, was returning from work as a mechanic at General Motors plant in Norwood, Ohio.[1] Apparently, while driving in Ohio on Interstate 71 toward his home in Kentucky, Mr. Taylor experienced some difficulty with his automobile. As the events were reconstructed in the evidence, it appears that he pulled to the side of the road, alighted from the vehicle and opened the hood with the engine still running. Then one blade from the automobile's fan detached itself and was flung like a spear by centrifugal force directly into Mr. Taylor's chest. He was able to get back into the vehicle and send a call for help over his Citizen's Band radio. By the time the police responded he was unconscious, and he died a short time later at a nearby hospital as a result of the injury.

After some difficulty, the plaintiff here, Sandra Elaine Taylor, widow of the deceased, and her attorneys identified the fan as a product of General Motors, as they believed. This action resulted, based on plaintiff's claim that the fan was defectively designed in that it was not sufficiently resistant to metal fatigue. Discovery in the action disclosed that the fan had actually been manufactured by the Hayes-Albion Company, but by this time it was too late to make Hayes-Albion a defendant. Eight hundred thousand of the fans had been produced, approximately ninety-nine percent of which Hayes-Albion sold to General Motors for use in its automobiles and as spare parts and approximately one percent of which were sold by Hayes-Albion directly to the Checker Motor Company for use on its taxicabs. The plaintiff was unable to prove that the fan was one of those which had passed through the possession of G.M., as opposed to one of those sold by Hayes-Albion to Checker. It was not unlikely that Taylor procured the fan from an auto parts yard and it could have come from a wrecked Checker cab.

The exact arrangements between General Motors and Hayes-Albion regarding the manufacture of the fan and the legal ramifications resulting therefrom have proved extremely troublesome and are the subject of this opinion. Although Hayes-Albion manufactured the fans and sold them to General Motors or Checker, General Motors was intimately involved in the entire process. Some of the aspects of this involvement by General Motors are:

1. G. M. originally gave Hayes-Albion the sketch or drawing showing how it wanted the fan built;

2. G. M. issued Hayes-Albion stop-work orders when appropriate;

3. G. M. ordered Hayes-Albion to mutilate and destroy any fans remaining after General Motors ordered that the fan no longer be made;

4. G. M. had to approve and accept the fan design before Hayes-Albion could mass produce;

5. In June 1968, G. M. decided to redesign the blade contour and bent tip;

6. G. M. alone decided in 1973 that the blade type should be discontinued;

---

1. This action is brought by Taylor's estate based on his use of the product as a consumer. His employment at General Motors is coincidental.

7. Hayes-Albion sold the fan only to G. M. and to Checker at General Motor's suggestion to Checker;

8. Hayes-Albion could not make the part until G. M. gave its complete approval.

General Motors' defense to this action was two-fold. First, it forcefully contended that it was not the manufacturer of the product and that the plaintiff was unable to establish that it was the seller or distributor of it. Second, it argued the fan had been designed for use on specific kinds of engines and specific models of General Motors' automobiles and that it was being used on none of these at the time of Mr. Taylor's tragic accident.

Factually, the evidence bore out these contentions. As has been stated above, G. M. did not manufacture the fan, Hayes-Albion did. The evidence showed that Mr. Taylor liked to shift around engines and their parts making new and different combinations. At the time of the accident the fan was being used on an engine for which it had not been tested and the engine in turn was in a type of vehicle for which it had not been designed. Plaintiff's theory against General Motors was that in its control of the design and its performance of the durability testing of the fan, it had been negligent in that it tested the fan only for those stresses to be encountered in the specific models of automobile in which the fan blade was to be used. The evidence showed that different stresses would be encountered in different kinds of automobiles which might cause metal fatigue in the fan. This resulted from the different air-flow patterns in different engines and engine-compartment configurations.

Plaintiff hypothesized that G. M. could have easily designed the fan blade to resist stresses to be encountered in any passenger automobile. Further, plaintiff introduced evidence that G. M. could have required Hayes-Albion to affix some kind of warning to the fan that it should only be used in certain models, since the propensity of mechanical tinkerers to interchange automobile parts was reasonably foreseeable by G. M.

At the instructions conference, the plaintiff specifically requested instructions based on her theory of strict products liability. A separate warning instruction was also requested. Being of the opinion that such instructions were inappropriate since G. M. was not the manufacturer of the fan and plaintiff had been unable to show that it was the seller or distributor or otherwise in the distribution chain, the court held that she was not entitled to such instructions. The court did submit the case to the jury on a negligence theory based on G. M.'s performance of the durability testing and input into the design.[2]

Kentucky has followed the strict liability approach set forth in Restatement of Torts 2d § 402A, since 1965.[3] Kentucky's highest Court has construed the text of § 402A in a series of decisions culminating in *Nichols v. Union Underwear*.[4] In general, Kentucky's approach to the design defect problem has been closely related to negligence principles. Thus, the currently approved instruction with regard to design defect, as found

---

**2.** The court submitted the following special interrogatory to the jury with accompanying instructions defining "ordinary care," etc.

I.

Do you find from a preponderance of the evidence that the defendant, General Motors, failed to use ordinary care to provide reasonable safety for prospective users in:

(1) Establishing the criteria for or performing the durability (resistance to metal fatigue) testing for the automobile fan described in the evidence?

YES___ NO___
OR

(2) Otherwise participating in designing said fan, if you believe it did so participate.

YES___ NO___

The jury answered both parts of the special interrogatory "no." The court also submitted interrogatories pertaining to contributory negligence and proximate cause, which the jury did not reach.

**3.** *Dealer's Transport Company v. Battery Distributing Company*, 402 S.W.2d 441 (Ky.1965).

**4.** 602 S.W.2d 429 (Ky.1980).

in *Nichols,* is very close to that given by the court in this case.[5]

Kentucky products law also imposes on a defendant subject to strict liability principles a broadly construed duty to warn, which is applicable in addition to the duty to properly design. Thus, if defendant G. M. here had the duties of a "seller" under § 402A, it would have had the duty to warn the consumer of the fan of unreasonably dangerous consequences of foreseen applications of it and even of foreseeable misuse.[6] We reach then the precise issue in this case, which is: Did G. M. have the duties of a "seller" under § 402A, including the duty to warn, or merely those of a designer?

The black letter of § 402A states that it applies to "one who sells any product in a defective condition." Comment f of that section states that the term "seller" comprises "any manufacturer or wholesale or retail dealer or distributor."

Nevertheless, examination of the cases cited by plaintiff in her motion for new trial convinces this court that the Kentucky courts would apply the strict liability principles of § 402A to General Motors in this case. "[T]he doctrine of strict liability in tort has been applied as against certain classes of persons who do not fall into the technical category of a 'seller' of a defective product."[7] In appropriate circumstances courts have applied the doctrine to lessors of personal property.[8] It has also been applied to home builders and franchisors.[9]

It has been said that in construing § 402A "the term 'sell' is merely descriptive and a product is considered sold if it has been placed in the stream of commerce by any means."[10]

It has also been said:

"We realize that the latest version of the section of the Restatement of Torts 2d dealing with a manufacturer's liability speaks of one who sells any product in a defective condition. But we think the Court of Appeals would regard this, as we would, as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold, intentionally excluding instances where a manufacturer has placed a defective article in the stream of commerce by other means."[11]

Some courts have applied strict liability principles to any entity which is "an integral part of the composite business enterprise which placed the defective [product] in the stream of commerce." *Kasel v. Remington Arms Company.*[12]

The rationale given for such an approach is:

"... under the stream of commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created con-

---

5. "You will find for the plaintiff only if you are satisfied from the evidence that the material of which the T-shirt was made created such a risk of its being accidentally set on fire by a child wearing it that an ordinarily prudent company engaged in the manufacture of clothing, being fully aware of the risk, would not have put it on the market; otherwise, you will find for the defendant." 602 S.W.2d at 433.

6. *Post v. American Cleaning Equipment Corporation,* 437 S.W.2d 516 (Ky.1969).

7. Frumer & Friedmann, *Products Liability* § 4:30.

8. *Id.;* Annotation 51 ALR 3d 1344.

9. Frumer & Friedman, *op.cit. supra* n.7.

10. *Todd Shipyards Corporation v. Turbine Service, Inc.,* 467 F.Supp. 1257, 1295 (D.C.E.D.La. 1978); *Greeno v. Clark Equipment Company,* 237 F.Supp. 427 (D.C.N.D.Ind.1965).

11. *Delaney v. Tow Motor Corporation,* 339 F.2d 4, 6 (2nd Cir. 1964).

12. 24 Cal.App.3d 711, 101 Cal.Rptr. 314, 322 (1972).

sumer demand for and reliance upon the product (and not the defendant's legal relationship such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability. (*Garcia v. Halsett, supra*, 3 Cal. App.3d 319, 82 Cal.Rptr. 420 wherein the court stated (at p. 325, 82 Cal.Rptr. at p. 423): 'The precise legal relationship between the parties has not played a particularly significant role in the cases imposing strict liability . . .' " [13]

■ This court believes that this so-called "stream of commerce" theory is the most enlightened approach and that the Kentucky courts would adopt it. In reaching this conclusion, the court is greatly persuaded by the opinion of Judge Merritt in *Kosters v. 7-Up Company*.[14] Since the Sixth Circuit Court of Appeals was applying Michigan law in that opinion this court is not bound thereby in interpreting Kentucky law. However, the cogent reasoning of *Kosters* convinces this court that the posture of General Motors in the case at bar is analogous to that of the franchisor in *Kosters*. Although there is no standardized legal label for G. M.'s intimate relationship with Hayes-Albion, as pointed out above, "the precise legal relationship between the parties has not played a particularly significant role in the cases imposing strict liability." [15]

In *Kosters* the plaintiff was injured by an alleged negligently designed carton for a soft-drink bottle which permitted a bottle to fall from the carton and break, injuring the plaintiff. The carton was manufactured by a franchisee of the defendant 7-Up, but 7-Up retained the right of control over the design and labeling of the carton and actually inspected it.

Judge Merritt defined franchising as "a method of selling products and services identified by a particular trade name which

may be associated with a patent, a trade secret, *a particular product design or management expertise.*" [16] Other than the trade-name aspect of the definition, the relationship between General Motors and Hayes-Albion could be considered a type of franchise.

The issue in *Kosters* was defined as follows:

"The precise question before us here is whether Michigan's principles of 'strict accountability' for breach of implied warranty extend to a franchisor who retains the right of control over the product (the carton) and specifically consents to its distribution in the form sold but does not actually manufacture, sell, handle, ship or require the use of the product." [17]

The *Kosters* court emphasized the "franchisor's sponsorship, management and control of the system for distributing" the product, "plus its specific consent" to the use of the product. In the court's view these elements placed "the franchisor in the position of a supplier of the product for purposes of tort liability." [18]

The court adduced four elements to be considered in determining whether a franchisor who is not a manufacturer, retailer or distributor of a product is subject to the strict liability doctrine:

"When a franchisor consents to the distribution of a defective product bearing its name, the obligation of the franchisor to compensate the injured consumer for breach of implied warranty, we think, arises from several factors in combination: (1) the risk created by approving for distribution an unsafe product likely to cause injury, (2) the franchisor's ability and opportunity to eliminate the unsafe character of the product and prevent the loss, (3) the consumer's lack of knowledge of the danger, and (4) the consumer's

---

13.  101 Cal.Rptr. at 323.

14.  595 F.2d 347 (6th Cir. 1979).

15.  *Kasel v. Remington Arms Company*, 101 Cal.Rptr. at 323.

16.  595 F.2d at 352. (Emphasis added).

17.  *Id.*

18.  595 F.2d at 353.

reliance on the trade name which gives the intended impression that the franchisor is responsible for and stands behind the products. Liability is based on the franchisor's control and the public's assumption, induced by the franchisor's conduct, that it does in fact control and vouch for the product."

■ This court recognizes that the position of G. M. in the instant case is not totally comparable with that of the defendants in *Kosters* and *Kasel, supra.* There is no element of G. M.'s vouching for the product by reason of use of its trade name, as far as the evidence in this case is concerned. The evidence of plaintiff is completely consistent with G. M.'s theory that the fan could have been acquired as a used part from one of the Checker cabs and not through a distributive chain of which G. M. was a link. Since the name of the manufacturer or distributor was not stamped on the fan blade, Taylor might have acquired the fan without knowing who manufactured it.

Nevertheless, the first three factors enunciated in *Kosters*, as listed above, are present here. Further, it cannot be denied that G. M. was "an integral part of the composite business enterprise" which was responsible for placing the fan "in the stream of commerce." G. M. exercised strict control over the design and testing of the product, particularly with regard to the critical factor of the durability standards for resistance to metal fatigue. It was G. M. which made the crucial decision that the fan should be designed to resist stresses to be encountered only in a few models of cars when with slight additional expense it could have been made safe for use in any passenger car. Considering these factors, this court holds that the Kentucky Supreme Court in the development of its products doctrine would apply strict liability principles to G. M. in this case.[19]

Inasmuch as this court has determined that the strict liability doctrine as set forth in Restatement of Torts 2d § 402A, as interpreted by the Kentucky courts, should have been applied to General Motors here and the instructions requested by the plaintiff, particularly a warning instruction, should have been given, the plaintiff's motion for a new trial must be granted, since the court further believes that the denial of these instructions was prejudicial.

IT IS SO ORDERED.

---

**19.** This ruling is in harmony with Kentucky's rejection of the requirement of privity in products cases in permitting by-standers to bring strict liability cases. *Embs v. Pepsi-Cola Bottling Company*, 528 S.W.2d 703 (Ky.1975). The policies stated in *Embs* of spreading the risk of loss and developing the doctrine along lines dictated by common sense rather than technicalities support the result reached by the court here.