# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

00-1043

_____

Robert Ford; Bobbie Sue Ford,

 Appellees,

  v.

GACS, Inc.,

 Appellant.

_____

00-1352

_____

Robert Ford; Bobbie Sue Ford,

 Appellants,

  v.

GACS, Inc.; General Motors Corporation,

 Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeals from the United States District Court for the Western District of Missouri.

_____

Submitted:  April 10, 2001
Filed:  September 7, 2001

_____

Before HANSEN and BYE, Circuit Judges, and MELLOY,[1] District Judge.
_____

HANSEN, Circuit Judge.

GACS, Inc. (hereinafter "GACS") appeals from the district court's denial of its motion for judgment as a matter of law following a jury verdict awarding Robert Ford both compensatory and punitive damages on his products liability and negligence claims for injuries he sustained while using a product designed by GACS. Robert Ford and Bobbie Sue Ford cross-appeal from the district court's grant of summary judgment in favor of General Motors Corporation (hereinafter "GM") related to the same incident. We affirm the jury's award of compensatory damages to Mr. Ford but we reverse the district court's denial of GACS's motion for judgment as a matter of law on the punitive damages. We also affirm the district court's grant of summary judgment to GM.

I.

These appeals arise from the use of a ratchet system used to tie down new automobiles to an automobile transport trailer during highway transport. Robert Ford was a truck driver who hauled new automobiles for his employer, Complete Auto Transit. He was injured while untying a one-ton pickup from his trailer. GACS designed and manufactured the ratchet system used by Mr. Ford when he was injured, and GACS sold the trailer on which it was mounted to his employer.

_____

[1]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa, sitting by designation.

Understanding the mechanics of the ratchet tie-down system designed by GACS is critical to Ford's claims of negligence and product defect. Ford's trailer was equipped with a chain and ratchet system, a very manual-intensive process that is commonly used by automobile transporters. To secure a hauled vehicle to the trailer, the driver attaches the hooked end of a chain to a preformed slot on the vehicle's frame and the other end of the chain is affixed to the ratchet device's spool, which is mounted on the trailer. The ratchet is then rotated to tighten the chain around the spool, pulling the hauled vehicle down against the resistance offered by its own suspension system. As the ratchet is rotated, a pawl clicks into place in the ratchet's gear-like teeth, which in turn prevents the spool from reversing rotation and the chain from loosening. The driver uses a "tie down bar," a steel rod about three feet long, which is inserted into holes around the outside of the ratchet, to gain the leverage needed to turn the spool sufficiently to tighten down the vehicle. Because the pawl clicks into place automatically as the spool is turned, the driver is able to use both hands and both arms to exert force on the tie down bar to tie down the vehicle. A separate ratchet and chain device secures each corner of the transported vehicle.

A vehicle is "untied" by reversing the process. To loosen the chain, the driver pulls down on the tie down bar exerting enough countervailing force to take the pressure off the pawl so that he can flip the pawl out of the way and allow the ratchet to unwind and loosen the chain in short increments. The driver generally uses both arms and both hands to apply the force required on the tie down bar to further tighten the chain enough so as to free up the pawl. Once the driver has released the pressure against the pawl, however, he must use one hand to flip the pawl out of the way while maintaining the extra force necessary to hold the tie down bar in position with the other arm.

GM, as an automobile manufacturer, worked closely with others in the automobile transportation industry to continually develop and to improve the equipment used to haul its automobiles. GM organized the GM Haulaway Committee, consisting

3

of carriers that regularly transported GM vehicles and trailer manufacturers, which, among other things, shared new ideas and concepts related to shipping automobiles. As early as 1979, studies concerning injuries to drivers during the tying and untying processes were reported at various GM Haulaway Committee meetings. GACS's president, Earl Lempke, attended many of the GM Haulaway Committee meetings at which driver injuries were discussed.

GACS developed a quick release ratchet in 1979 that allowed the driver to untie the vehicle without manually lifting the pawl out of the way, resulting in a quicker and safer procedure for untying vehicles. GACS did not equip the trailers that it manufactured with the quick release ratchet at that time, however, because GM did not approve of its carriers using the quick release ratchet because of potential damage to the vehicle being transported. GM required that equipment used to haul its new vehicles be approved by GM and comply with procedures outlined in GM's shipping manual. The manual explained the proper procedure for tying down vehicles to avoid damage to the vehicle. It did not address safety issues and GM was not involved in training any of the carriers' employees. GACS developed various alternatives to the traditional chain and ratchet system which would have eliminated the need for countervailing manual force to untie vehicles during the 1980s and early 1990s, none of which were approved by GM. GM finally approved of a quick release ratchet in 1994, after Mr. Ford was injured. GACS incorporated the quick release ratchet into its trailers soon after it was approved by GM.

Mr. Ford had 28 years of experience as an automobile hauler at the time of his injury. Ford's injury occurred on December 15, 1993, while he was untying a one-ton pickup from his load. Ford testified that he had over-tightened that particular vehicle to meet the 13 feet 6 inch load height limitation for transport on Interstate highways, although he had been instructed by his employer to request a change in the load configuration rather than to overtighten a vehicle down to meet the load height requirement. Attempting to untie the truck, Ford pulled down on the tie down bar to

slacken the pressure on the pawl, and as he removed one hand from the tie down bar to reach up and flip the pawl out of the way, he "felt a sudden snap or sudden release, and excruciating pain" in his shoulder. (Tr. at 83.) Ford tore his rotator cuff and was never able to return to work as an automobile hauler.

Prior to trial, the district court granted GM's motion for summary judgment. The case proceeded to trial against GACS. The jury returned a verdict in favor of Ford on both of his claims, assessing his total compensatory damages at $150,000. The district court reduced the compensatory award to $105,000 based on the jury's apportionment of fault. The jury also awarded Ford $200,000 in punitive damages.

## II. GACS's Appeal

Following the jury verdict, GACS moved for judgment as a matter of law, or alternatively for a new trial, which the district court denied. On appeal, GACS argues that the compensatory damages cannot stand as a matter of law under either the negligence claim or the products liability claim because any danger presented by the device was open and obvious. It argues that the punitive damages cannot stand because there was no evidence of evil motive. Finally, GACS argues that the district court erred in denying its motion for a new trial based on improper jury instructions related to Ford's duty to mitigate damages.

## A. Products Liability

We review de novo the district court's denial of GACS's motion for judgment as a matter of law. "Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." Foster v. Time Warner Entm't Co., L.P., 250 F.3d 1189, 1194 (8th Cir. 2001) (internal quotations and citations omitted). The

parties agree that Missouri law controls this case, which reaches us by reason of the parties' diverse citizenship.

GACS argues that the alleged danger–which it defines as requiring excessive force to operate the ratchet–was open and obvious because Ford had used the ratchet and applied similar force thousands of times over his 28 years as an automobile hauler. GACS argues that the openness and obviousness of the danger precludes liability as a matter of law. In the context of a Missouri products liability claim, however, the openness and obviousness of a defect does not automatically preclude judgment. The Missouri legislature abolished contributory fault for products liability cases, replacing it with pure comparative fault. See Miller v. Varity Corp., 922 S.W.2d 821, 826 (Mo. Ct. App. 1996) (discussing the effect of Missouri's adoption of comparative fault on products liability claims involving open and obvious dangers). The plaintiff's knowledge of a danger is one of the enumerated items of fault to be compared in a products liability case. See Mo. Rev. Stat. § 537.765(3)(3); see also Miller, 922 S.W.2d at 826 (holding that the open and obvious nature of a defect does not bar recovery but is appropriately considered in apportioning fault). Thus, under Missouri products liability law, the openness and obviousness of any alleged design defect in the ratchet does not preclude recovery as a matter of law. See Anderson v. F.J. Little Mach. Co., 68 F.3d 1113, 1117 & n.2 (8th Cir. 1995) (reversing summary judgment in a products liability case under Missouri law and noting that although the obviousness of a defect is material, it "stops far short of compelling judgment for the manufacturer, and indeed demonstrates that a fact finder must consider the issue").

GACS's argument that the ratchet was not unreasonably dangerous because the amount of force required to operate the ratchet was known to Ford relies on what is often termed the "consumer expectations" test for determining what is unreasonably

dangerous.[2]  The Missouri courts have repeatedly declined to adopt a test–the consumer expectations, risk-utility,[3] or any other–for determining what is unreasonably dangerous.  Rather, what is unreasonably dangerous "needs no judicial definition" and is left as an ultimate fact question for the jury, to be decided by allowing the jury to apply "'their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties.'" Rodriguez v. Suzuki Motor Corp., 996 S.W.2d 47, 65 (Mo. 1999) (en banc) (quoting Newman v. Ford Motor Co., 975 S.W.2d 147, 154 (Mo. 1998) (en banc)); see also Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496, 506 (8th Cir. 1993) (holding that plaintiff's knowledge of danger posed by nail gun did not preclude jury verdict on products liability claim under Missouri law); Miller, 922 S.W.2d at 825-26 (affirming jury verdict for plaintiff on products liability claim based on defendant's failure to equip tractor with a roll over protection system). Missouri courts prefer to allow "litigants 'to argue that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence . . . .'" Rodriguez, 996 S.W.2d at 65 (quoting Newman, 975 S.W.2d at 154).

Ford offered evidence of GACS's awareness of safer alternatives to the traditional manual ratchet system, particularly the quick release ratchet that GACS developed in 1979 long before Ford's injury.  There was also evidence that injuries from the force required to tie and untie vehicles were a concern in the industry and that the quick release ratchet would eliminate the high force levels needed to untie a vehicle,

---

[2]A product is unreasonably dangerous under this theory only if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it."  Restatement (Second) Torts, § 402A cmt. i.

[3]Under the risk-utility test, numerous factors are considered in determining whether a reasonable alternative design would have reduced the foreseeable danger posed by the product such that omission of the alternative design renders the product not reasonably safe.  See Restatement (Third) of Torts: Products Liability § 2(b).

the same activity Ford was performing when he was injured. GACS offered evidence of Ford's extensive experience tying and untying vehicles and his knowledge of the risks associated with using the ratchet. Ford's expert opined that the levels of force required to properly tie down a vehicle were unreasonably dangerous, while GACS's expert testified that they were not. The jury instruction tracked the statute, instructing the jury that the ratchet system had to be "in a defective condition unreasonably dangerous when put to a reasonably anticipated use" before GACS could be held strictly liable. (J.A. at 1235.) The instruction was broad enough to allow the jury to apply either theory argued by the parties–consumer expectations as argued by GACS or risk-utility as argued by Ford. Although both parties offered evidence to refute the other's theory, the jury was apparently persuaded by Ford's argument of the evidence. On these facts, we cannot say that no reasonable juror could have found for Ford. The district court correctly rejected GACS's motion for judgment as a matter of law on Ford's products liability claim.

The jury returned a special verdict, finding GACS liable under both the negligence and the products liability theories. It assessed GACS's fault at 70% and Ford's fault at 30% under both theories. The jury valued Ford's compensatory damages at $150,000, which the district court apportioned based on the jury's fault allocations. Because we hold that the products liability claim was properly submitted to the jury and the verdict is supported by the evidence, we need not reach GACS's argument concerning the negligence claim. The products liability finding supports the damages award, regardless of the outcome on the negligence claim.

B. Punitive Damages

"The test for punitive damages in Missouri is a strict one." Drabik, 997 F.2d at 510. Punitive damages may be awarded in a negligence case only "if the defendant knew or had reason to know a high degree of probability existed that the action would result in injury." Letz v. Turbomeca Engine Corp., 975 S.W.2d 155, 164 (Mo. Ct.

8

App. 1997) (opinion adopted & reinstated after retransfer Sept. 29, 1998). Before punitive damages are warranted in a products liability case, the defendant must have placed an unreasonably dangerous product in commerce with actual knowledge of its defect. Id. at 164-65; see also Drabik, 997 F.2d at 510. Punitive damages are appropriate under either theory of recovery only if the defendant "showed a complete indifference to or conscious disregard for the safety of others." Letz, 975 S.W.2d at 165. Ultimately, the defendant "must have acted with some degree of wantonness or bad motive." Drabik, 997 F.2d at 510.

GACS was aware that the level of force used on the ratchets resulted in some injuries to drivers. GACS worked to reduce those injuries by developing alternative systems for securing automobiles that did not require excessive force to operate, including the quick release ratchet. Though it did not implement those other designs for various reasons, the fact that it worked to design a safer system belies the level of reckless indifference or conscious disregard for the safety of others necessary to support an award of punitive damages. See id.

A manufacturer does not necessarily act with the requisite wantonness to support punitive damages by continuing to manufacture a product with the knowledge of some injuries. "[T]he defendant must be aware of unreasonable danger, not just any danger." Id. In 1990, Complete Auto Transit employees reported 494 total injuries from tying or untying automobiles, 255 of which resulted in lost time. Employees reported a total of 277 injuries in 1991, of which 248 resulted in lost time. GACS's president testified that these numbers, which resulted in an injury .001% of the times the ratchet was used, led him to believe that the ratchet was not inherently dangerous. Although Ford countered that based on these same numbers, an individual driver had a 10% chance of being injured in a given year, these number games do not establish that GACS was aware of an unreasonable danger to the driver.

9

The safety of a product must also be weighed against its utility. See id. at 511 (noting that many products, such as knives or nail guns, have a certain degree of danger that is outweighed by the product's utility). An acceptable automobile tie down system must keep the automobiles from coming loose from the trailer and endangering other travelers as well as secure the automobiles without damaging them. GACS manufactured its trailers primarily to transport GM automobiles. At the time of Ford's injury, the chain and ratchet system, which was standard in the industry, was the only method for securing automobiles that GM had approved. We do not suggest that a manufacturer may ignore safety concerns based on customer demand, but it does go to the wantonness required for a punitive damages award. See id. at 510 (noting that the fact that the product design was the standard in the industry was "relevant to show that [the defendant] was not willfully indifferent"). On these facts, there simply is not the evidence of evil motive or reckless disregard by GACS necessary to support a punitive damages award. See, e.g., Lopez v. Three Rivers Elec. Co-op., Inc., 26 S.W.3d 151, 160 (Mo. 2000) (en banc) (comparing the defendant's conduct to the Missouri Supreme Court's classic example of a person firing a rifle into a moving passenger train as the level of knowledge of a high degree of probability of injury required to support punitive damages). GACS is entitled to judgment as a matter of law on the punitive damages claim.

## C. Jury Instructions on Mitigation

GACS's final point on appeal is that the district court erred in failing to submit two proposed jury instructions involving Ford's failure to mitigate his damages by seeking other employment. We review the district court's refusal to submit a requested instruction to the jury for abuse of discretion. St. Jude Med., Inc. v. Lifecare Int'l, Inc., 250 F.3d 587, 594 (8th Cir. 2001). "[R]eview is limited to whether the instructions, viewed on the whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Id. (internal quotations and citations omitted). Because this is a diversity case, the substance of the jury

instructions must fairly and adequately represent Missouri law. <u>Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.</u>, 254 F.3d 706, 711 (8th Cir. 2001).

Under Missouri law, comparative fault encompasses a plaintiff's unreasonable failure to mitigate his damages. <u>See</u> Mo. Rev. Stat. § 537.765.3(6); <u>Love v. Park Lane Med. Ctr.</u>, 737 S.W.2d 720, 724 (Mo. 1987) (en banc). "To be charged to the jury, an issue submitted in an instruction must be supported by substantial evidence from which the jury reasonably could find such issue." <u>Kauzlarich v. Atchison, Topeka, & Santa Fe Ry. Co.</u>, 910 S.W.2d 254, 258 (Mo. 1995) (en banc) (internal quotations and citations omitted). Because mitigation of damages is an affirmative defense, GACS bears the burden of establishing that Ford could have lessened his damages. <u>Id.</u> at 256.

Following Ford's surgery for his torn rotator cuff, Ford's doctor released him to work with restrictions on lifting, which precluded him from returning to his prior position as an automobile hauler. Ford's employer did not offer him any other type of work. Ford ultimately received Social Security disability benefits, workers' compensation, and pension disability benefits following his injury. Ford testified that he did not seek alternative work because he would not be able to find a job that paid as much as he was receiving from these sources, which would have been terminated if he had taken another job. A vocational expert met with Ford in 1999. He reviewed Ford's medical records from the time of the accident and administered various tests to Ford. He opined that given Ford's shoulder impairment, preexisting breathing problems, advanced age, limited tenth grade education, prior extensive work history exclusively as an automobile hauler, and the restrictions Ford's doctor placed on his lifting, Ford was unemployable, both in 1999 when the expert met with Ford and following the injury. GACS countered only with evidence that Ford did not look for another job and that his doctor released him to some kind of work consistent with the lifting restrictions. It offered no evidence about the job market or any jobs Ford might be qualified to perform.

11

To meet its burden of proof, GACS "must show that [Ford] had an opportunity to mitigate and the reasonable prospective consequences." Bus. Men's Assur. Co. of Am. v. Graham, 891 S.W.2d 438, 448 (Mo. Ct. App. 1994). "It is not enough for the [defendant] to prove that the plaintiff made no effort to get other employment, but he must go further and prove that such employment could have been secured." Stewart v. Bd. of Educ. of Ritenour Consol. Sch. Dist., R-3, 630 S.W.2d 130, 134 (Mo. Ct. App. 1982) (internal quotations omitted). GACS failed to meet its burden of establishing its affirmative defense of failure to mitigate damages. As such, the district court did not abuse its discretion in refusing the proffered instructions. Cf. Kauzlarich, 910 S.W.2d at 258 (holding that the trial court erred in refusing a mitigation of damages instruction where defendant offered expert testimony of job opportunities in the market place, considering plaintiff's age, education, work experience, and physical limitations; plaintiff had attended over two years of college and worked at a wide variety of jobs; and plaintiff rejected former employer's offer to retrain).

III. Fords' Cross-Appeal

The Fords cross-appeal the district court's grant of summary judgement in favor of GM. The Fords contend that summary judgment is inappropriate because a fact issue exists regarding whether GM prohibited use of the quick release ratchet. The Fords also argue that an entity that influences the design of a product through its economic relationship with the manufacturer may be held liable for both negligence and products liability.

We review the district court's grant of summary judgment de novo. "Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact in dispute." Larsen v. Mayo Med. Ctr., 218 F.3d 863, 866 (8th Cir.), cert. denied, 121 S. Ct. 625 (2000).

12

A. Products Liability

Missouri has adopted section 402A of the Second Restatement of Torts as its products liability jurisprudence, as codified at section 537.760 of the Missouri Revised Statutes. The common thread among Missouri products liability cases is that an entity must have "'plac[ed] a defective product in the stream of commerce.'" Bailey v. Innovative Mgmt. & Inv., Inc., 916 S.W.2d 805, 807-08 (Mo. Ct. App. 1995) (quoting Gunderson v. Sani-Kem Corp., 674 S.W.2d 665, 668 (Mo. Ct. App. 1984) and holding that construction company which loaned a nail gun to its employee was not strictly liable when friend of employee was injured by nail gun because it did not place the nail gun into the stream of commerce; rather, it engaged in an isolated, noncommercial transaction by loaning the gun to its employee); Meschik v. Mid-Am. Pipeline Co., 812 S.W.2d 861, 863 (Mo. Ct. App. 1991) (holding that by adding odorant to propane gas, common carrier placed defective propane gas into stream of commerce because odorant was the cause of the claimed defect); see also Mo. Rev. Stat. § 537.760(1) (requiring as the first element of a products liability claim that the plaintiff establish that "[t]he defendant, wherever situated in the chain of commerce, transferred a product in the course of his business"). "'[I]t is the defendant's *participatory connection, for his personal profit or other benefit*, with the injury-producing product and *with the enterprise that created consumer demand for and reliance upon the product* which calls for the imposition of strict liability . . . .'" Bailey, 916 S.W.2d at 807-08 (quoting Gunderson, 674 S.W.2d at 668).

Some courts have extended products liability to entities that are "an integral part of the composite business enterprise which was responsible for placing [the defective product] in the stream of commerce." Taylor v. Gen. Motors, Inc., 537 F. Supp. 949, 954 (E.D. Ky. 1982) (internal quotations omitted) (applying Kentucky law). The court in Taylor held that General Motors was a proper party to be held strictly liable for a defective fan manufactured by another company for General Motors because "G.M. exercised strict control over the design and testing of the product, particularly with

regard to the critical factor of the durability standards for resistance to metal fatigue [which was the alleged defect]." Id. Similarly, the Arizona Supreme Court held Goodyear Tire & Rubber Company (hereinafter "Goodyear") strictly liable for a defective tire manufactured by its European subsidiary, Goodyear Tire & Rubber (Great Britain), Ltd., because Goodyear had a licensing agreement with the subsidiary, which required the subsidiary to manufacture the tires in accordance with Goodyear's formulas, specifications, and directions. Torres v. Goodyear Tire & Rubber Co., Inc., 786 P.2d 939, 942 (Ariz. 1990). The court found strict liability to be appropriate because "Goodyear participated significantly in the design, manufacture, promotion, and sale that resulted in the product reaching the consumer." Id. at 945.

GM cannot be said to have placed the ratchet system into the stream of commerce in this case. GM is the customer of the hauler, who in turn is the customer of the alleged defective product's designer and manufacturer. True, GM approved of the allegedly defective ratchet system for use in transporting its vehicles and, for purposes of summary judgment, we presume disapproved of the quick release ratchet, which would have been safer for automobile haulers. GM collaborated with trailer manufacturers and carriers through the GM Haulaway Committee to exchange ideas and discuss proper methods for hauling GM automobiles. However, GM did so as a customer. It did not specify the design to be used, but merely accepted or rejected the systems developed and offered by the designers. When GM was made aware of injuries associated with use of the ratchet system, it asked the designers to develop a better ratchet. It did not attempt to design one itself. The Fords have not offered any evidence that GM was involved in the actual design, manufacture, or marketing of the ratchet, other than to accept or reject a particular tie down system consistent with its needs.

We have noted that Missouri courts "have confined the reach of [the products liability] doctrine to distributors either by sale, lease, or bailment." Wright v. Newman, 735 F.2d 1073, 1079 (8th Cir. 1984). We have not found any Missouri cases, nor have

14

the parties directed us to any, that have extended products liability beyond those entities. Even if we believed that the Missouri judiciary would extend its products liability doctrine to cover entities that were "an integral part of the composite business enterprise which was responsible for placing [the defective product] in the stream of commerce," Taylor, 537 F. Supp. at 954, GM does not fit that description in this case. GM's status as a dominant customer of the automobile carriers may factor into such a discussion, but the remaining facts do not support such a conclusion. We decline to extend the reach of Missouri's products liability law to the facts of this case.

### B. Negligence

To establish a claim for negligence, Ford must prove that GM "had a duty to protect [him] from injury, [GM] failed to perform that duty, and [GM's] failure proximately caused injury to [Ford.]" Lopez, 26 S.W.3d at 155. "Whether a duty exists is purely a question of law." Id.

> 'The common denominator that must be present is the existence of a relationship between the plaintiff and defendant that the law recognizes as the basis of a duty of care.' [Bunker v. Ass'n of Mo. Elec. Coops., 839 S.W.2d 608, 611 (Mo. Ct. App. 1992).] In making this determination, [Missouri courts] refer 'to the body of statutes, rules, principles and precedents which make up the law.' Kopoian v. George W. Miller & Co., 901 S.W.2d 63, 68 (Mo. Ct. App. 1995).

Parra v. Bldg. Erection Servs., 982 S.W.2d 278, 283 (Mo. Ct. App. 1998). Where no duty is indicated by Missouri statute, case law, or otherwise, a fundamental prerequisite to establishing negligence is absent. See Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 773 (8th Cir. 1998) (affirming the dismissal of a negligence claim where Missouri law did not recognized a duty to recall an allegedly defective product under the circumstances of the case despite plaintiff's claim that the harm sustained was foreseeable).

15

Ford argues generally that his injury was foreseeable to GM because GM continued to reject safer tie down systems, despite its awareness of driver injuries. Ford fails to articulate a basis in Missouri law for any duty owed by GM to the employee of the company GM hired to transport its automobiles. As we discussed above, GM did not manufacture or design the ratchet system. It did not attempt to specify the design of the system, but left that to the manufacturers' designers. Nor did it train the drivers who utilized the allegedly defective ratchet system. It merely rejected certain tie down systems as not meeting its needs. We have found no Missouri cases that have imposed a duty on an entity that influences the design of a product by its rejection of proffered alternatives. Under these facts, we cannot say "that the Missouri Supreme Court would create a common law duty" on GM's part to protect Ford from injuries sustained while using the ratchet system. Id. The district court correctly dismissed GM from the suit.

IV.

For the foregoing reasons, we affirm the district court's denial of GACS's motion for judgment as a matter of law pertaining to the compensatory damages, but we reverse its denial of the motion as it relates to punitive damages. We affirm the district court's grant of summary judgment in favor of GM.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

16