# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3621

_____

| | | |
|---|---|---|
| Ronald C. Torbit, Susan Torbit, | * | |
| | * | |
| Plaintiffs - Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Ryder System, Inc., | * | |
| | * | |
| Defendant, | * | |
| | * | |
| GACS, Inc., formerly known as | * | |
| Delavan Industries, Inc., formerly | * | Appeal from the United States |
| known as Ryder Automotive Carrier | * | District Court for the |
| Group, Inc., formerly known as Ryder | * | Eastern District of Missouri. |
| Automotive Operations, Inc., formerly | * | |
| known as Ryder Automotive Carrier | * | |
| Services, Inc., formerly known as | * | |
| Ryder Automotive Carrier Division, | * | |
| | * | |
| Defendant - Appellant, | * | |
| | * | |
| General Motors Corporation, C. F. | * | |
| Bender Company, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: December 16, 2004
Filed: July 28, 2005

_____

Before MELLOY, BOWMAN, and BENTON, Circuit Judges.
_____

BOWMAN, Circuit Judge.

GACS Incorporated ("GACS") appeals from a judgment entered on a jury verdict awarding plaintiffs Ronald C. Torbit ("Torbit") and his wife, Susan Torbit, substantial damages in this product-liability action. Torbit, a truck driver, suffered serious injuries to his shoulder and neck resulting from his use of a GACS ratchet system to secure vehicles to a vehicle-hauling trailer. GACS claims the District Court erred by 1) admitting evidence of other truck drivers' injuries that were not substantially similar to Torbit's injuries, 2) refusing to submit a comparative-fault instruction to the jury, and 3) permitting Torbit's testimony regarding his loss of future income. We affirm.

**I.**

**A.**

The trial record, read in a manner favorable to the jury verdict, McGuire v. Tarmac Envtl. Co., 293 F.3d 437, 439 (8th Cir. 2002), supports the following summary of the facts. Torbit worked for nearly eighteen years as a driver of specialized trucks used to haul new vehicles from the factory to the dealership. Torbit's duties required him to drive multiple vehicles onto the deck of a tractor trailer and secure each vehicle to the deck using a chain and ratchet system, then reverse the process upon reaching each vehicle's destination. On October 23, 1998, while using a tie-down bar to untie a vehicle secured by the ratchet system, Torbit felt a jerking motion and a slapping sensation between his neck and shoulder. Over the next few

days, the pain became excruciating. Torbit was later diagnosed with a torn labrum[1] in his shoulder and three herniated discs in his cervical spine.[2]

While on medical leave from his job as a car hauler, Torbit underwent three surgeries to correct or alleviate his injuries. These surgeries included two cervical-fusion operations to repair his herniated discs and an operation to repair his torn labrum. After his first cervical-fusion operation, Torbit's doctor imposed medical restrictions that prevented him from returning to his job as a car hauler because the job required lifting and loading. After a lengthy search for comparable employment, Torbit finally secured a driving job with another employer that required no lifting or loading, but at a fraction of the salary he had earned as a car hauler. Torbit worked at the new job until the pain he experienced became intolerable. Torbit then underwent the second cervical-fusion operation, and while he was recuperating he was terminated from his car-hauling job.

Then fifty-one years old, Torbit was particularly distressed that after having worked eighteen years toward his pension as a unionized car hauler, he could not work the additional two years required for his pension to partially vest. Further, Torbit's pension would have fully vested in seven years, after he reached twenty-five years of employment. Torbit therefore offered to sweep floors for his original employer to get the additional work time, but his offer was declined.

Torbit then persuaded his doctor to lift Torbit's medical restrictions, and he attempted to be rehired by his original employer as a car hauler. The employer, however, sent Torbit to a company doctor who refused to allow Torbit to return to

---

[1]The term "labrum" refers to a "lip around the margin of the concave portion of some joints." Physician's Desk Reference Medical Dictionary 957 (2d ed. 2000).

[2]The term "cervical" means "of or relating to [the] neck." Webster's Third New Int'l Dictionary (Unabridged) 367 (1981).

work.  Finally, Torbit invoked the union collective bargaining agreement and consulted a doctor designated by the union to determine Torbit's employability. Torbit literally begged this doctor to allow him to work for the two years necessary to receive his partial pension, and the doctor struck a deal with Torbit.  He would be allowed to work, but if the pain prevented Torbit from working effectively, the medical restrictions would be renewed.  His employer subsequently rehired Torbit as a car hauler.

Torbit's surgeries have left him with no flexibility in his neck and with aggravated pain in his shoulder when he attempts overhead lifting or pulling.  Torbit currently takes Darvocet, Ibuprofen, and Excedrin on a daily basis to relieve his pain. Still, Torbit continues to work as a car hauler and has refused to seek further medical restrictions until he reaches the twenty-year employment mark.

**B.**

Alleging a design defect in the ratchet system, Torbit sued GACS, the designer and manufacturer of the ratchet system, based on a theory of strict product liability. Torbit claimed the ratchet system was defective because it required a driver to exert dangerously high force levels to utilize the system, and he claimed this defect caused his injuries.  The matter was first tried before a jury in October 2001.  The first trial ended when the District Court granted a motion by GACS for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.[3]  The basis for the ruling was that Torbit's expert lacked the qualifications necessary to give an opinion as to any defect in the ratchet system, and therefore no defect was shown.  In granting GACS's motion, the District Court also granted Torbit's motion for a new trial.

---

[3]The first trial was presided over by the Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

A second trial was held before a jury in November 2002.[4] At that trial, Torbit called a different expert who testified about injuries to drivers using a ratchet system similar to the ratchet system Torbit used.[5] Over GACS's continuing objection, the expert offered two charts that not only summarized injuries from tying and untying the ratchet system but also summarized completely unrelated injuries such as slipping and falling on ice, foreign bodies in the driver's eye, etc. The expert used these charts in explaining her opinion that the GACS ratchet system was defective. Also over GACS's objection, Torbit testified about his desire to work until his pension vested and about the amount of future income he would lose because of his injuries. GACS presented evidence to show Torbit had over-tightened the chain at the time of his injury and to show Torbit had failed to adhere to his training while untying the vehicle from the trailer.

At the close of evidence, GACS requested jury instructions based on comparative fault for Torbit's alleged over-tightening and failure to adhere to his training. GACS also requested a jury instruction that Torbit's testimony as to his loss of future income be disregarded given that Torbit was still working. The District Court allowed a comparative-fault instruction based on the over-tightening of the chain, but refused to give the instruction based on Torbit's failure to adhere to his training. The District Court also refused the instruction to disregard Torbit's testimony as to his loss of future income.

_____

[4]The second trial was presided over and final judgment was entered by the Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

[5]The expert's testimony was based in part on injuries reported to the Ryder Auto Carrier Division of companies ("Ryder ACD"), which included Torbit's employer.

The jury returned a verdict in favor of Torbit, finding that the GACS ratchet system was defective and that the defect had caused Torbit's injuries. The jury started with a base award of $770,000 for Torbit's damages. It then reduced that amount by ten percent for Torbit's comparative fault in over-tightening the chain, resulting in a total award for Torbit of $693,000. In addition, the jury awarded $30,000 to Susan Torbit for loss of consortium, which also was reduced by ten percent for Torbit's comparative fault in over-tightening the chain. GACS appeals.

## II.

GACS first claims it was error to admit the two charts offered by Torbit's expert witness summarizing driver injuries because there was no showing that those driver injuries were substantially similar to Torbit's injuries.[6] We review the District Court's decision to admit or exclude expert testimony for abuse of discretion. Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 327 F.3d 771, 779 (8th Cir. 2003) (citing General Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997)), cert. denied, 540 U.S. 1106 (2004). An abuse of discretion occurs in the context of admitting evidence only where the error is clear and prejudicial to the outcome of the proceeding. Lovett ex rel. Lovett v. Union Pac. R.R., 201 F.3d 1074, 1080 (8th Cir. 2000). Evidence of other injuries or accidents attributable to an allegedly defective product must be substantially similar to the injury or accident in the case at bar in order to be admitted in a product-liability case. Drabik v. Stanley-Bostitch, Inc., 997 F.2d 496, 508 (8th Cir. 1993) (citing Lewy v. Remington Arms Co., 836 F.2d 1104, 1108 (8th Cir. 1988)).

---

[6]GACS has not challenged, either in the District Court or on appeal, the expert's qualifications or the scientific validity of her methodology, nor has GACS questioned whether her evidence was of the type generally relied upon by experts in the field. Thus, a Daubert hearing was not required, see McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1407 (8th Cir. 1994) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)), and such a hearing was not requested.

We hold that the District Court did not commit a clear and prejudicial abuse of its discretion when it allowed Torbit's expert to use the charts. The expert stated that "a large percentage of the [total] injuries incurred by drivers were incurred during the tying and untying process." Trial Tr. vol. IV at 61.[7] She testified that the ratchet systems involved in the tying/untying injuries summarized by the charts were "substantially similar" to the GACS ratchet system Torbit was using when he suffered his injuries. Id. at 64. She also testified that from the injury records she was able to "call out those [injuries] that relate to exerting force on a tie-down bar on a manual ratchet system." Id. at 60. The charts summarized 3,459 injuries from tying/untying the ratchet systems between 1987 and 1995, and they summarized 1,184 injuries in 1990 from tightening or loosening chains. These injuries, respectively, amounted to 29% and 49.89% of the total injuries reported. When the charts were shown to the jury, the expert pointed out that the "top category is really the only one that's relevant to this case. Everything below the top line has to do with something other than tying and untying injuries." Id. at 73. In view of the expert's clear testimony, we credit the jury with the ability to distinguish between the tying/untying injuries and the other types of injuries listed on the charts.

## III.

Next, we address GACS's argument that the District Court erred by refusing a comparative-fault instruction based on Torbit's failure to adhere to his training.[8] We

---

[7]The transcript in the Court's record has two sets of page numbers. The citations herein refer to the page number in the right-hand margin at the top of each transcript page.

[8]At the jury instruction conference, the District Court allowed GACS to revise its comparative-fault instruction even though the deadline for submitting instructions in the case management order had passed. The District Court then stated that the revised instruction had been "offered and refused." Trial Tr. vol. VIII at 76. In doing so, the District Court appears to have waived the violation of its case management

review for abuse of discretion the District Court's decision to refuse the instruction. St. Jude Med., Inc. v. Lifecare Int'l, Inc., 250 F.3d 587, 594 (8th Cir. 2001). Viewed as a whole, the jury instructions must "fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury." Ford v. GACS, Inc., 265 F.3d 670, 679 (8th Cir. 2001) (quoting St. Jude Med., Inc., 250 F.3d at 594), cert. denied, 535 U.S. 954 (2002). Under this standard, a party is entitled to have the jury charged in accordance with its theory of the case if there is "*any evidence* to support the claim, direct or circumstantial." Agape Baptist Church, Inc. v. Church Mut. Ins. Co., 299 F.3d 701, 704 (8th Cir. 2002) (emphasis added) (quoting Strudl v. Am. Family Mut. Ins. Co., 536 F.2d 242, 246 (8th Cir. 1976)). In determining whether an instruction is warranted, we view the evidence in the light most favorable to the party offering the instruction, and we give that party the benefit of all reasonable inferences drawn from the evidence. Id. (quoting Hallberg v. Brasher, 679 F.2d 751, 757 n.6 (8th Cir. 1982)).

The Missouri statute regarding comparative fault in product-liability cases specifically limits "fault" to six uses or failures by the plaintiff. See Mo. Rev. Stat. § 537.765.3 (2000). Of these six, the fault from which GACS's proposed jury instruction was derived was the "[u]se of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to said danger." Id. § 537.765.3(3); Appellant's Br. at 30; Trial Tr. vol. VIII at 75. Therefore, the jury instruction requested by GACS was warranted if there was any evidence that 1) Torbit's training gave him knowledge and a reasonable appreciation of the danger involved in using the ratchet system, and 2) Torbit's failure to adhere to his training constituted a voluntary and unreasonable exposure to the danger. The burden of showing that the evidence warranted the instruction rested upon GACS. See Ford, 265 F.3d at 679.

order. Because the District Court did not take issue with the timeliness of GACS's offer of the revised instruction, neither do we.

GACS points to documents, admitted into evidence, on which Torbit's signature acknowledged that he received training in "loading and inspection techniques on Ryder ACD equipment," "the use of the tie-down bar and personal safety techniques on Ryder ACD equipment," and the "use of the tie-down bar in the ratchet system." Trial Tr. vol. III at 64–65. Torbit's signature on at least one of the documents acknowledged that he received instruction on personal safety taught from the Ryder ACD training manuals. Id. at 66. Drawing all reasonable inferences from this evidence in favor of GACS, it would be reasonable to infer that Torbit received the relevant training set forth in the instruction manual.

What we cannot reasonably infer from the evidence, however, is that Torbit had knowledge and a reasonable appreciation of the danger involved in using the ratchet system in a manner inconsistent with his training. Notably, it is unclear what type of injury was addressed by any safety training Torbit received. The training manual specified a method of untying the ratchet using a three-point stance in order to minimize "pulled muscles," id. at 112, and to prevent "slip and fall" accidents, Trial Tr. vol. II at 118. These are not of the same type and gravity as the serious injuries Torbit sustained, and we cannot infer that the manual gave Torbit knowledge or a reasonable appreciation that such injuries might occur. Nor can we infer Torbit voluntarily and unreasonably exposed himself to the risk of serious injury without some showing that he had knowledge and appreciation of the serious injuries he might sustain.

We also cannot reasonably infer that Torbit's use of the ratchet system in a manner inconsistent with his training was voluntary and unreasonable. The training manual stated that when untying a car from the upper deck the driver should "refrain from climbing up on the equipment *if at all possible*." Id. at 126 (emphasis added). This left open the possibility that climbing on the equipment might be required in some situations. Indeed, Torbit stated he climbed on the equipment the day he was

injured because he could not reach the ratchet from the ground. Trial Tr. vol. III at 75.

Further, although Torbit admits he was not using the recommended three-point stance when he was injured, id. at 111, he testified it was not possible to do so while untying the ratchet the day he was hurt, id. at 67–68. Similarly, the training supervisor called to testify about the training manual stated that a driver could not possibly maintain the three-point stance while releasing the ratchet on the trailer Torbit used. Trial Tr. vol. II at 119, 129. We cannot reasonably infer Torbit's failure to adhere to his training was voluntary or unreasonable without a showing that such adherence was possible.

For these reasons, even viewing the evidence in the light most favorable to GACS, there was no evidence to support the comparative-fault instruction based on Torbit's failure to adhere to his training. The District Court did not abuse its discretion by refusing the instruction.

**IV.**

Finally, GACS claims the District Court erred by allowing Torbit to testify about his damages for loss of future income and by refusing a jury instruction to disregard this testimony.[9] GACS argues that because Torbit was still working and

---

[9]Torbit also claimed damages for past medical expenses and for the loss of past income, and he presented evidence to support a jury award of such damages. As indicated earlier, the jury awarded Torbit damages of $770,000, reduced by ten percent to reflect his comparative fault, for a net award of $693,000. The jury award was a lump sum, so we have no way of knowing how much was awarded for loss of future income or any of the other claimed damages. We note that Torbit claimed total damages of $1,207,294 based on the assumption that he would retire, as he testified he would, when his pension partially vested after twenty years of service. Based on that same assumption, his claimed damages for the loss of future income alone were

-10-

there was no medical evidence that Torbit could not continue to work, the testimony as to his loss of future income was too speculative. Again, we review the District Court's decisions to admit the testimony and to refuse the instruction for abuse of discretion. Lovett, 201 F.3d at 1080, 1082; Mems, 327 F.3d at 779, 781. We will not grant relief unless the alleged error prejudiced the verdict or the substantial rights of the parties. Lovett, 201 F.3d at 1080, 1083; Mems, 327 F.3d at 779, 781.

Under Missouri law, a plaintiff in a personal-injury case may recover for a loss of future earnings based on evidence that is reasonably certain and affords a reasonable basis for estimating the losses. Fairbanks v. Weitzman, 13 S.W.3d 313, 319–20 (Mo. Ct. App. 2000) (citation to quoted case omitted). The evidence need only be of sufficient certainty to enable the jury to make a fair and reasonable estimate of the loss of future earnings. Id. at 320 (citation to quoted case omitted). This evidence may include the plaintiff's earnings before and after the injury. Id. In addition, evidence of pain and suffering existing at the time of trial may support an award for a loss of future income, even if the evidence comes solely from the plaintiff and is not corroborated by medical evidence, as long as there is a causal connection established between the pain and suffering and the occurrence at issue. See McPherson v. Bi-State Dev. Agency, 702 S.W.2d 129, 131–32 (Mo. Ct. App. 1985).

Torbit presented evidence of his earnings before he was injured and of his current earnings from the same employer. This evidence enabled the jury to make a reasonably certain estimate of what his future income would be. Torbit also produced substantial evidence of his injuries and their causal connection to his use of the ratchet system, his desire to work until his pension vested, and the agreement he struck with the union-designated doctor allowing him tentatively to return to work. The agreement removed existing medical restrictions that were based on serious

---

$840,000. Again, we have no reliable way of knowing how much of that the jury included in its overall award of $770,000.

injuries and that had prevented Torbit from returning to work, and its sole purpose was to allow Torbit to attempt to work until his pension vested. Torbit also testified about pain and suffering he was still experiencing at the time of trial, and this testimony satisfied the <u>McPherson</u> criteria.

GACS was free to argue to the jury, and did argue to a limited extent, that Torbit's retirement after his pension vested would be voluntary and not necessitated by his injuries. GACS was also free to argue that the question of whether or when Torbit actually would retire was purely speculative. Given the substantial evidence Torbit presented, however, the jury reasonably could infer that Torbit's injuries would necessitate an early retirement. The jury could also make a reasonably certain estimate of when that early retirement would occur and the amount of future income Torbit would lose as a result. Therefore, the District Court did not abuse its discretion by allowing Torbit to present evidence of his loss of future income or by refusing the jury instruction to disregard that evidence.

## V.

The judgment of the District Court is affirmed.

_____